## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

IN RE: LESLIE DWIGHT COFFEY,                                 Case No. 3:16-bk-16337
                                                                    (Chapter 7)
                               Debtor.


 CNR HOLDINGS, LLC                                                     PLAINTIFF

v.                            AP Case No. 3:19-ap-01055

LESLIE DWIGHT COFFEY                                                   DEFENDANT


UNITED STATES TRUSTEE                                                  PLAINTIFF

v.                            AP Case No. 3:19-ap-01059

LESLIE DWIGHT COFFEY                                                   DEFENDANT


### <u>MEMORANDUM OPINION</u>

CNR Holdings, LLC ("**CNR**") and Daniel J. Casamatta, Acting United States Trustee for

Region 13 (the "**UST**"), filed separate adversary proceedings against Leslie Dwight Coffey

("**Mr. Coffey**"), seeking to have Mr. Coffey's discharge denied.  In CNR's complaint (AP Case

No. 19-1055), CNR seeks to deny Mr. Coffey's discharge based on Mr. Coffey's conduct in the

present case.  CNR asserts that Mr. Coffey's discharge should be denied pursuant to 11 U.S.C.

§ 727(a)(2)(A), (a)(3), (a)(4)(A), (a)(4)(D), (a)(5), and (a)(6)(A).  The complaint filed by the

UST (AP Case No. 19-1059) alleges these same grounds for denying Mr. Coffey's discharge.

Considering the overlap between CNR's complaint and the UST's complaint, all the parties

consented to the adversary proceedings being tried together.

A consolidated trial on the merits was held over four days in Jonesboro, Arkansas, on March 2–3, 2022, April 18, 2022, and April 20, 2022.  Jeannette Robertson appeared on behalf of CNR, Joseph DiPietro appeared on behalf of the UST, and Mr. Coffey appeared pro se.  At the consolidated trial, CNR, the UST, and Mr. Coffey agreed that all the evidence introduced would apply and could be considered in determining the disposition of each adversary proceeding.  At trial, Mr. Coffey was called as a witness by CNR and the UST, and he testified on his own behalf.  In addition, Ms. Rene Kimery ("**Ms. Kimery**") was called as a witness and testified on behalf of CNR and the UST.  After the trial, the Court took the matter under advisement.

## I.  JURISDICTION

The Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 1334 and 157.  The matters are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(J).  The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## II.  FACTS

Mr. Coffey is not new to the bankruptcy court system and has had experience in both bankruptcy court and federal district court.  Prior to his current bankruptcy case, he filed a Chapter 11 individual bankruptcy case in Tennessee in 2005; a Chapter 11 individual bankruptcy case in Georgia in 2008; a Chapter 11 business case in Georgia in 2009 for Peerless Self Storage, LLC ("**Peerless Storage**"), an entity owned 100% by Mr. Coffey; an involuntary petition in Tennessee in 2011 against The Truman Landscaper, Inc. ("**Truman Landscaper**"), an entity owned 100% by Mr. Coffey; a Chapter 13 individual bankruptcy case, pro se, in Arkansas in 2013; a civil action in the United States District Court for the Eastern District of Arkansas in 2016, pro se, against CNR and others; and the current Chapter 13 bankruptcy case, pro se, in

Arkansas in 2016. (UST's Ex. 1). In addition to evidence concerning all these cases, CNR and the UST also introduced evidence concerning issues that arose from their requests for production of documents from Mr. Coffey. Evidence introduced concerning the various legal proceedings, as well as the issues arising from the production of documents, will be summarized below.

A. **Legal Proceedings**

*(1) 2005 Chapter 11 Case, Case No. 1:05-bk-14721-NWW*

Mr. Coffey's first bankruptcy case was a Chapter 11 case filed in the Eastern District of Tennessee on August 1, 2005 (the "**2005 Case**"). Mr. Coffey was represented by counsel in the 2005 Case. The summary of schedules introduced by CNR and the UST reflects assets of $5,928,926.92 and liabilities of $3,829,314.84. Mr. Coffey testified that this bankruptcy case was filed to save certain properties from foreclosure, including two pieces of commercial real estate and a lake house that he owned at the time with Paula Sue Coffey. Mr. Coffey testified that the creditor holding the secured claim against the properties would not renew the line of credit loan secured by the properties unless Paula Sue Coffey signed the loan documents. According to Mr. Coffey, she refused to sign.

Twenty-one pieces of real property were listed in the schedules with a total value of $5,795,000.00, including the properties located at "7041 & 7045 Maplewood Lane, Chattanooga, TN" (the "**Maplewood Properties**"). (Cr.'s Ex. 6, at 6). Mr. Coffey testified that all the properties listed were deeded in his name except the Maplewood Properties and 3115 Freeman Avenue, Chattanooga, Tennessee (the "**Freeman Property**"). He testified that he listed the Maplewood Properties and Freeman Property because he was a guarantor on the loans and had an interest in making sure the loans were paid. He also testified that he owned 100% of the companies that owned the Maplewood Properties and the Freeman Property. As to the

Maplewood Properties specifically, Mr. Coffey testified that around 2008 the Circuit Court of

Hamilton County, Tennessee, awarded him a 100% interest in the two properties.

Mr. Coffey also listed the following interests in "incorporated and unincorporated

businesses" in the 2005 Case:

> 100% Lesco Services of Tennessee, Inc.
>  40%  Flintstone, LLC
>  29%  Lesco Services, Inc.
> 100% Truman Landscape [sic], Inc., d/b/a Lesco Services

(Cr.'s Ex. 6, at 9).  All of the business interests were listed with a current market value of

"[u]nknown."  (Cr.'s Ex. 6, at 9).  All four of the entities listed above did business under the

name of "Lesco Services."

Business information from the Georgia Corporations Division was introduced into

evidence reflecting that Truman Landscaper was formed on December 31, 1997, and dissolved

on September 11, 2010.  Mr. Coffey owned 100% of this corporation.  As stated above, Truman

Landscaper did business under the name "Lesco Services."  Between 2000 and 2003, the two

entities together grossed over $1,000,000.00 a month in revenue.  The address for the principal

office was listed as Post Office Box 242, Lookout Mountain, Tennessee.  Mr. Coffey testified

that this post office box was used for personal mail as well as business mail for all entities

associated with the Coffey family.  At the time the 2005 Case was filed, Mr. Coffey was living at

203 East Brow Road, Lookout Mountain, Tennessee.  He also listed $133,926.92 in personal

property in his schedules, which included a $44,921.00 401(k) account and a $38,432.00 profit

sharing account.

In the 2005 Case, Mr. Coffey's second amended plan was confirmed, and a final decree

was entered on September 21, 2006.

### (2) *2008 Chapter 11 Case, Case No. 08-23003-reb*

Mr. Coffey filed a second Chapter 11 case in the Northern District of Georgia on October 21, 2008 (the "**2008 Case**"). Mr. Coffey was represented by counsel in the 2008 Case. Mr. Coffey testified that he listed his assets accurately in his schedules. He also testified that various assets listed in the 2005 Case were sold to pay creditors prior to the filing of the 2008 Case. Mr. Coffey's address was reflected on the petition as "2357 Hwy 197, Clarkesville, Georgia." (Cr.'s Ex. 8, at 1). An amended summary of schedules was filed on December 8, 2008, reflecting $5,027,800.00 in assets and $4,205,292.00 in liabilities.

Mr. Coffey's Schedule A listed a fee simple ownership interest in thirteen pieces of real property valued at $2,850,000.00, including the Maplewood Properties and the Freeman Property. Mr. Coffey testified that, although he had not been deeded the Maplewood Properties, he listed himself as having a fee simple ownership in the properties because he was awarded the properties "free of the marital estate" by the state court. (Tr. at 78). The Maplewood Properties were listed in the schedules with a value of $150,000.00 and First Tennessee Bank was listed as a mortgage lien holder with a secured claim of $62,000.00. The personal property listed in the schedules totaled $2,170,800.00.

The schedules also reflected Mr. Coffey's interest in three entities: Peerless Storage (100 shares) valued at $1,600,000.00, 733 Glendale LLC (300 shares) valued at $90,000.00, and CNR (100 shares) valued at $54,000.00.

Mr. Coffey was the sole member of Peerless Storage in 2008. He believes the $1,600,000.00 valuation that was given on his schedules was taken from the tax assessor's records. Peerless Storage owned a 1.35 million square foot building situated on thirty-five acres of land approximately six miles from downtown Chattanooga, Tennessee.

5

In response to Question 18 in his statement of financial affairs ("**SOFA**"), which asked for a list of businesses in which Mr. Coffey held positions such as officer, director, partner, or sole proprietor, Mr. Coffey responded by listing Lesco Services, Inc., Peerless Storage, and Truman Landscaper.  The only business that was listed as still operating on the petition date was Peerless Storage.

Rossville Metal Recyclers LLC ("**Rossville Metal**") was not originally listed in the schedules or SOFA in the 2008 Case.  On December 8, 2008, Mr. Coffey's response to Question 18 on his SOFA was amended to add Rossville Metal.  However, the amendment did not state a position held or the nature of his interest.  He also added his interest in "Lesco Services, an erosion control company as a sole proprietorship."  (UST's Ex. 7, at 1).

The United States Trustee for Region 21 filed a motion to dismiss or convert the 2008 Case in January 2009.  The allegations in the motion included that Mr. Coffey failed to list "his ownership interest in [Rossville Metal] and Lesco Services, Inc."  (UST's Ex. 9, at 1–2).  After a hearing on the motion to dismiss or convert, the court dismissed the 2008 Case, finding that Mr. Coffey did "not have the ability to reorganize and that further administration . . . under either chapter 11 or chapter 7 [was] not in the interest of creditors."  (UST's Ex. 10, at 1–2).  No determination was made concerning Mr. Coffey's ownership interest in Rossville Metal.

While the 2008 Case was pending, Mr. Coffey and Paula Sue Coffey were going through an acrimonious divorce.  After the 2008 Case was dismissed, Mr. Coffey decided to liquidate all of his assets himself and "allow the cards to fall where they may."  (Tr. at 587).  Mr. Coffey explained the reason for liquidating everything was to rid himself of all property with ties to Paula Sue Coffey and start over.  The assets were sold, and proceeds were divided with Paula Sue Coffey or used for living expenses.

6

### *(3)  Peerless Storage Chapter 11 Case, Case No. 09-21115-jrs*

The third bankruptcy case involving Mr. Coffey was the Chapter 11 case of Peerless Storage, filed on December 1, 2008, in the Northern District of Georgia (the "**Peerless Chapter 11**").  The voluntary petition for relief was signed by Leslie Dwight Coffey as "Owner/Manager" of Peerless Storage.  (Cr.'s Ex. 14, at 3).

Mr. Coffey was the sole owner of Peerless Storage and was directing the case with his attorneys.  The address used on the petition for Peerless Storage was the Lookout Mountain, Tennessee, post office box address.  Mr. Coffey testified that he lived in Lookout Mountain until around 2011.  The summary of schedules reflects a significant amount of equity in the business with $3,030,250.00 in assets and $1,559,246.00 in liabilities.

On March 11, 2011, while the Peerless Chapter 11 case was pending, a motion to sell certain assets was filed in the case including "materials of significant value" that could be "salvaged through a demolition and scrap/salvage process."  (Cr.'s Ex. 48, at 2; UST's Ex. 20, at 2).  The motion sought approval to hire someone to demolish the property to realize the value of the materials to be sold.  Significantly, the motion provided, "In the alternative, however, [Peerless Storage] would maintain the option of doing the demolition, itself, by contracting with Rossville Metals Recyclers, LLC, an entity owned by Les Coffey, principal of [Peerless Storage].  Such alternative would net no less than $750,000.00 from the sale of salvaged materials."  (Cr.'s Ex. 48, at 3; UST's Ex. 20, at 3).

The UST introduced a status report in which the trustee in the Peerless Chapter 11 case reported Mr. Coffey's uncooperative nature in following an order of the court regarding certain personal property items and further described Mr. Coffey's hostile demeanor in dealing with the trustee.  (UST's Ex. 21).

While the Peerless Chapter 11 case was pending, the Chapter 11 trustee also filed an adversary proceeding for injunctive relief and damages against Mr. Coffey. The complaint alleged that Mr. Coffey filed "criminal warrant applications against the Chapter 11 Trustee . . . in an effort (a) to interfere with the Chapter 11 Trustee's orderly and lawful administration of the bankruptcy estate and (b) to waste time and expenses of the bankruptcy estate and the Chapter 11 Trustee." (UST's Ex. 23, at 3). The complaint also alleged that Mr. Coffey's "contacts and communications" with the Chapter 11 trustee were "intentionally designed to harass and to exhaust what [he] knows to be limited resources available to the lawful administration of the bankruptcy estate." (UST's Ex. 23, at 5). The underlying bankruptcy case of Peerless Storage was later converted to a Chapter 7 proceeding and this adversary proceeding was dismissed.

Mr. Coffey testified that eventually the trustee abandoned Peerless Storage's property and a lienholder foreclosed its interest in the property. The property sold for only $125,000.00 because of environmental issues.

### (4) Truman Landscaper Case, Case No. 1:11-bk-15051-NWW

On September 13, 2011, Mr. Coffey, as the petitioning creditor, filed an involuntary petition for relief under Chapter 11 against Truman Landscaper in the Eastern District of Tennessee (the **"Truman Chapter 11"**). The docket sheet lists the address for Mr. Coffey as the Lookout Mountain, Tennessee, post office box address. This filing occurred approximately seven weeks after First Tennessee Bank, N.A., First Horizon, N.A., assigned to CNR its interest in a loan to Truman Landscaper secured by the Maplewood Properties. Mr. Coffey asserts that this assignment was made in error.

On December 24, 2011, the Truman Chapter 11 case was dismissed, following Mr. Coffey's failure to appear at a show cause hearing set to determine why the case should not

be dismissed for Mr. Coffey's failure to prosecute.  When asked at trial if the filing of the involuntary petition was "just a delaying tactic on your part to stop CNR from taking ownership and sale of the [Maplewood Properties]," Mr. Coffey responded, "I mean, I don't know.  I mean, I—I don't remember it, but it makes sense."  (Tr. at 162–63).

### (5)  2013 Chapter 13 Case, Case No. 3:13-bk-14405

A voluntary petition under the provisions of Chapter 13 was filed in the name of Leslie Dwight Coffey on August 5, 2013, in the Eastern District of Arkansas (the "**2013 Case**"). Mr. Coffey testified that he did not hire an attorney to assist in the filing, and most likely completed the schedules himself, but did not specifically recall most of the information.  The petition did not disclose Mr. Coffey's previous bankruptcy filings.  In addition, although a signature appears on the petition page, it is not Mr. Coffey's signature.  He admitted that he would have authorized someone to sign his name to the petition, but he did not recall who signed it for him.

While testifying during his own cross examination, Mr. Coffey gave some background on a back injury he sustained from an accident in a warehouse he was cleaning out for Rossville Metal.  The accident occurred in August 2012, and he broke his back in three places.  Over the course of the next four years, he suffered a great amount of pain and testified that he was taking "eight five-milligram Dilaudids a day" for his back pain.  (Tr. at 604).  At the time this petition was filed, it was his testimony that he "was so drugged that [he] didn't even know who [he] was hardly . . . [or] what [he] was doing."  (Tr. at 604).

The summary of schedules reflects assets of $20,081,700.00 and liabilities of $48,008.00. The assets included a malicious prosecution claim listed in Schedule B valued at $20,000,000.00. The petition listed Mr. Coffey's address as 737 Westwood Drive in Trumann, Arkansas (the

9

"**Trumann Property**").  The petition states that Mr. Coffey "has been domiciled or has had a residence, principal place of business, or principal assets in [the Eastern District of Arkansas] for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District."  (Cr.'s Ex. 11, at 2; UST's Ex. 11, at 2).  Mr. Coffey testified that he became a resident of Trumann, Arkansas at the beginning of 2013 when he broke his back and came to Arkansas for treatment at UAMS.

The Trumann Property was not listed in Schedule A, nor was any other property in Arkansas.  Mr. Coffey testified that he had never owned any real property in Arkansas.  Schedule A in the original filing listed 10127 Birchwood Pike, Harrison, Tennessee (the "**Birchwood Property**"), as the only real property owned by Mr. Coffey.  His interest was described as "Equitable Interest due to Marriage."  (Cr.'s Ex. 11, at 4; UST's Ex. 11, at 4).  This schedule was amended by Mr. Coffey on August 22, 2013, to reflect the Maplewood Properties as the only real property owned by Mr. Coffey.  The amended schedule again listed Mr. Coffey's interest as an "Equitable Interest due to Marriage."  (Cr.'s Ex. 13; UST's Ex. 12).  Mr. Coffey admitted that the interest he claimed in the Maplewood Properties was based on his belief that the deeds and documents he prepared gave title to the Maplewood Properties to Dana Jill Coffey, his wife, and Leslie Nicole Coffey, his daughter.

CNR and the UST both introduced a driver record from the State of Tennessee dated October 25, 2015, in the name of Leslie Dwight Coffey.  The record reflects that Mr. Coffey was originally issued a Tennessee driver's license on November 12, 2004, and was later issued a Tennessee driver's license on July 7, 2013, with an expiration date of September 16, 2017.  Mr. Coffey remained adamant that he had an Arkansas driver's license at the time the 2013 Case was filed and stated that apparently his Tennessee driver's license was not canceled.  He recalls

10

coming to Arkansas to establish his residency in January 2013 after his accident because Arkansas offered certain health insurance coverage that Tennessee and Georgia did not, and because Arkansas had only one of five doctors who had experience treating his type of back injury. When asked by the UST's attorney if he had a Tennessee driver's license on December 1, 2016, the date the current bankruptcy case was filed, Mr. Coffey responded, "No. And I hadn't had for a couple of years before." (Tr. at 486).

On his personal property schedules, Mr. Coffey listed household goods and furnishings located at the Maplewood Properties. When asked about the location of his personal property, Mr. Coffey stated that he owned the property, but it was being used by his daughter, Nicole. On his Schedule B, Mr. Coffey also listed "railroad leases in Rossville Georgia" as an asset with a current value of $30,000.00. (Cr.'s Ex. 11, at 6; UST's Ex. 11, at 6). He asserted in his schedules that he had no automobiles. During his case-in-chief, however, Mr. Coffey introduced a 2013 personal property assessment from the Poinsett County Assessor's records for Leslie D. Coffey, which reflected a 2008 Honda Odyssey Mini Wagon.

Schedule I reflects that Mr. Coffey was disabled and had no monthly income. His spouse is listed as being a "Business Owner" with monthly income of $2,750.00 from the operation of a business and $650.00 from real property for a total monthly income of $3,400.00. (Cr.'s Ex. 11, at 18; UST's Ex. 11, at 18). Mr. Coffey testified that his spouse owned thirty percent of Rossville Metal. The income from real property was generated from the Birchwood Property.

In the statement of financial affairs, Mr. Coffey stated that he had no income from the operation of a business, as an employee, or from any other source during the two years immediately preceding the filing of the petition. He admitted this was incorrect because he had income in 2011 and 2012. Mr. Coffey's 2012 tax return transcript, Schedule C—Profit or Loss

11

From Business, reflected a scrap metal business with $126,354.00 in gross receipts or sales and a net loss of $16,073.00.  Similarly, Mr. Coffey's 2011 tax return transcript, Schedule C—Profit or Loss From Business, reflected a scrap and junk dealer business with $150,573.00 in gross receipts or sales and a net profit of $66,523.00.  Mr. Coffey testified that he did not have any income in 2013 from the "operation of a business or doing any kind of business."  (Tr. at 420).

Question 18 of the SOFA asked for the names of all businesses in which Mr. Coffey was "an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity" or in which the "debtor owned 5 percent or more of the voting or equity securities" within six years immediately prior to the bankruptcy filing.  (Cr.'s Ex. 11, at 29–30; UST's Ex. 11, at 29–30).  Mr. Coffey's response to the question was "[n]one."  (Cr.'s Ex. 11, at 30; UST's Ex. 11, at 30).  Mr. Coffey admitted this was an inaccurate statement.

On September 9, 2013, the 2013 Case was dismissed due to Mr. Coffey's failure to pay the filing fee by the extended due date to do so.  After the case was dismissed, Mr. Coffey filed an adversary proceeding against CNR and others.  The adversary proceeding was dismissed as moot because the bankruptcy case had been dismissed.  The bankruptcy case was closed on December 19, 2013, but on March 21, 2014, Mr. Coffey filed a motion to reopen the case.  After a hearing on the motion, the Court entered an order on May 5, 2014, denying the motion to reopen stating, in part:

> In addition to the explanations provided [in open court] when denying the motions, the Court also notes that although the Debtor testified he lives in Arkansas, his bankruptcy petition lists no assets or debts in Arkansas. Furthermore, questions 13 and 14 on Schedule B of the Debtor's bankruptcy petition specifically requires the disclosure of an interest in an LLC as an asset. During the hearing, the Debtor relied on his ownership interest in a limited liability company to support his arguments, but he did not list any interest in a limited liability company or any other business organization on Schedule B.

12

>The Court, exercising its discretion, denies the Debtor's motions and finds
>that the Debtor filed bankruptcy to litigate and relitigate issues concerning
>property in Tennessee and Georgia rather than to use the bankruptcy code for the
>purposes for which it was intended.

(Cr.'s Ex. 21, at 1–2; UST's Ex. 13, at 1–2).

### (6)  U.S. District Court Case, Case No. 3:16-cv-00222-DPM

On August 26, 2016, Mr. Coffey, pro se, filed a civil action against CNR and others in

the Eastern District of Arkansas (the "**District Court Case**").  The District Court Case was

dismissed on October 27, 2016.  The docket entry states in part, "Coffey's complaint will be

dismissed without prejudice.  This is not the correct Court to address the alleged violation of the

automatic stay; rather it is a matter for the Bankruptcy Court."  (Cr.'s Ex. 27, at 2).

### (7)  Current Bankruptcy Case, Case No. 3:16-bk-16337

On December 1, 2016, Mr. Coffey, pro se, filed the bankruptcy case now before the

Court (the "**Current Case**").  Mr. Coffey testified that he personally prepared and filed the

bankruptcy petition and schedules in the Current Case.  The summary of assets and liabilities

reflects $131,134.00 in total assets and $799,526.00 in total liabilities.  Mr. Coffey admitted that

the assets listed in the Current Case represented a "very large change" from the value of his

assets reflected in his 2005 Case and his 2008 Case.  (Tr. at 444).

A copy of the bankruptcy petition was introduced into evidence.  Part 7 of the petition

provides, in part, "I have examined this petition, and I declare under penalty of perjury that the

information provided is true and correct."  (Cr.'s Ex. 1, at 5; UST's Ex. 15, at 5).  Mr. Coffey's

signature appears below this statement.  The petition reflects that Mr. Coffey was living at the

Trumann Property when the petition was filed.  He later testified at a 2004 examination,

discussed in more detail below, that he lived at the Trumann Property for the 180-day period

prior to the bankruptcy petition being filed, but that his wife was living in the Birchwood Property in Chattanooga, Tennessee.

In response to Question 12 on the petition, Mr. Coffey stated he was not "a sole proprietor of any full- or part-time business." (Cr.'s Ex. 1, at 4; UST's Ex. 15, at 4). Mr. Coffey testified that at the time of the petition filing this was a correct statement.

Mr. Coffey's schedules were also introduced into evidence and contained a declaration signed by Mr. Coffey stating, "Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct." (Cr.'s Ex. 1, at 9; UST's Ex. 15, at 9). Mr. Coffey acknowledged that he signed this declaration.

Mr. Coffey listed two pieces of real property in his schedules. First, he claimed he owned a "Marital Interest" in the Birchwood Property. (Cr.'s Ex. 1, at 10; UST's Ex. 15, at 10). He valued the entire property at $135,000.00 and valued his interest in the property at $1.00. Next, he claimed an "Equitable Interest due to Marriage" in the Maplewood Properties. (Cr.'s Ex. 1, at 10; UST's Ex. 15, at 10). He valued the entire property at $195,000.00 and valued his interest in the properties at $1.00.

In response to Question 17 of Schedule A/B asking if he owned or had "any legal or equitable interest in . . . [d]eposits of money *Examples*: Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions," Mr. Coffey checked "[n]o." (Cr.'s Ex. 1, at 14; UST's Ex. 15, at 14). Mr. Coffey was asked at trial about a Scottrade account. He stated that he did not believe such an account was in existence at the time the Current Case was filed. A letter from Scottrade Bank addressed to Mr. Coffey at the Birchwood Property address was also introduced into evidence. The letter concerned the status of a disputed point of sale transaction in the amount of $874.24. The letter

was dated June 17, 2016, and referenced an account number ending in 7492.  During questioning by the UST's attorney, Mr. Coffey admitted that, based on CNR's exhibits, "there's a probability" that he had a Scottrade account on the petition date.  (Tr. at 432).

In addition to the above letter, a motion filed by Mr. Coffey, pro se, on May 10, 2017, was introduced into evidence.  The motion sought an order to show cause against, among others, his ex-spouse, Paula Sue Coffey, and the State of Tennessee Department of Human Services for placing a lien against "a joint account the debtor holds with his children with Scottrade."  (Cr.'s Ex. 51, at 2; UST's Ex. 24, at 2).  The motion further states the Scottrade account "has the debtors [sic] disability monies and sole income deposited into it."  (Cr.'s Ex. 51, at 2; UST's Ex. 24, at 2).  The motion states the lien was placed on the account on May 1, 2017.  It goes on to allege that, in addition to being an investment account for his oldest daughter, it was a "clearing account for the debtors [sic] sole income as listed on his schedules" and "[t]he debtor now has no way to pay his basic bills and living expenses."  (Cr.'s Ex. 51, at 2; UST's Ex. 24, at 2).  A "Notice of Seizure of Assets" dated May 1, 2017, was attached to the motion stating that Mr. Coffey's "assets being held by Scottrade Inc. are subject to a lien by the Department of Human Services and have been seized to satisfy a child support arrearage in the amount of $29,978.00 as of 5/01/2017."  (Cr.'s Ex. 51, at 10; UST's Ex. 24, at 10; UST's Ex. 33).  The notice was addressed to Mr. Coffey at the Birchwood Property address and references an account number ending in 7424.

Question 20 in Mr. Coffey's statement of financial affairs was also related to financial accounts.  Question 20 asked, "Within 1 year before you filed for bankruptcy, were any financial accounts or instruments held in your name, or for your benefit, closed, sold, moved, or transferred?"  (Cr.'s Ex. 1, at 49; UST's Ex. 15, at 49).  Mr. Coffey responded by checking the

"[n]o" box.  (Cr.'s Ex. 1, at 49; UST's Ex. 15, at 49).  When asked about his failure to list the Scottrade accounts in his schedules, Mr. Coffey made the statement that he "wasn't hiding it or [he] wouldn't have produced the documents."  (Tr. at 375).

In his Schedule A/B, in response to Question 31 asking whether Mr. Coffey had an interest in any insurance policies, Mr. Coffey responded by checking the box "[n]o."  (Cr.'s Ex. 1, at 17; UST's Ex. 15, at 17).  Mr. Coffey admitted at the trial that this response was incorrect stating, "It's dead wrong.  Because I—it says disability, which we know I had disability, because I listed the income.  And then, life insurance."  (Tr. at 434).  He admitted that he had not amended his schedules to reflect his interest in disability insurance and life insurance.

In response to Question 30 on Schedule A/B asking for information on amounts he has due from someone else, Mr. Coffey listed the following: "Workers comp claim, WTC Claim, Social Security claim" and valued all three claims at $1.00.  (Cr.'s Ex. 1, at 16; UST's Ex. 15, at 16).  The UST introduced a medical report dated November 20, 2012, in connection with Mr. Coffey's worker's compensation claim.  The report was completed by a case manager, a registered nurse, who interviewed Mr. Coffey about this injury.  The report states that Mr. Coffey reported "that he is divorced and lives at P.O. Box 242 Lookout Mountain, TN, and has lived there for more than two years."  (UST's Ex. 37).  Mr. Coffey stated this is correct because he moved to Arkansas in early 2013.

Mr. Coffey valued his "[c]laims against third parties" at $1.00 and his "[o]ther contingent and unliquidated claims of every nature" at $1.00.  (Cr.'s Ex. 1, at 17; UST's Ex. 15, at 17).  However, he also included a list of claims against fifty-four different individuals and entities as an attachment to the schedules with the following explanation for the inclusion:

> List of additional claims against other parties that have not been collected, litigated and or resolved

16

> This additional page is intended to protect the debtors [sic] interest and list said interest in said claims from being barred in future case due to not being listed on the bankruptcy petition
>
> Said list should be considered part of the petition it is attached to

(Cr.'s Ex. 1, at 20; UST's Ex. 15, at 20).  The list included, "State Farm Insurance, on 4 different policies."  (Cr.'s Ex. 1, at 20; UST's Ex. 15, at 20).

There were four secured creditors listed in Mr. Coffey's schedules: Ocwen Loan with a claim of $50,000.00 secured by the Birchwood Property; Trust Federal Credit Union with a claim of $5,000.00 secured by a 2005 Honda Accord; CNR with a claim of $11,000.00 listed as a "Right to Offset"; and Paula Sue Coffey with a claim of $750,000.00 secured by "Property Settlement in divorce." (Cr.'s Ex. 1, at 25–26; UST's Ex. 15, at 25–26).

The IRS and Paula Sue Coffey were listed as priority unsecured creditors with claim amounts both listed as $1.00.  Wells Fargo Bank, Charter Communications, Credit Bureau of Jonesboro, City of Atlanta, Emergency Coverage Corp., Erlanger Health Systems, Verizon Wireless, Revenue Recovery, Stellar Recovery Inc./Dish Network, John D. Moss, Chattanooga Publishing Co., and Chattanooga Golf and Country Club were listed as unsecured creditors.

Mr. Coffey reported his occupation as "Disabled" and then listed $5,100.00 as "Pension or retirement income" on his Schedule I.  (Cr.'s Ex. 1, at 36–37; UST's Ex. 15, at 36–37).  He also reported his non-debtor spouse as being a self-employed "Business Owner" with no business income.  (Cr.'s Ex. 1, at 36–37; UST's Ex. 15, at 36–37).  The non-debtor spouse was listed with social security income of $1,465.00 per month.  When asked by the UST's attorney what business his spouse owned, Mr. Coffey responded that "[s]he was a thirty percent owner of Rossville Metal[]."  (Tr. at 437).

17

Mr. Coffey's statement of financial affairs was also introduced into evidence. Mr. Coffey admitted that he signed the last page of the statement. His signature appeared under the statement, "I have read the answers on this *Statement of Financial Affairs* and any attachments, and I declare under penalty of perjury that the answers are true and correct." (Cr.'s Ex. 1, at 52; UST's Ex. 15, at 52).

As stated above, the petition reflects that Mr. Coffey lived at the Trumann Property on the petition date. In his statement of financial affairs he answered "[n]o" to the question of whether he had lived anywhere else during the past three years. (Cr.'s Ex. 1, at 41; UST's Ex. 15, at 41). During his case-in-chief, Mr. Coffey introduced a copy of the billing history from City Water & Light for 316 South Main Street, Jonesboro, Arkansas (the "**Main Street Residence**"). He stated that from May 9, 2014, until May 15, 2015, he was living at the Main Street Residence. Jill Coffey lived there with him until March 5, 2015, when she left to move to Chattanooga, Tennessee, to take care of the grandchildren. Mr. Coffey left Jonesboro, Arkansas at the end of April 2015 and went to stay in Trumann, Arkansas.

Question 4 of Mr. Coffey's statement of financial affairs asked, "Did you have any income from employment or from operating a business during this year or the two previous calendar years?" (Cr.'s Ex. 1, at 42; UST's Ex. 15, at 42). Mr. Coffey responded by checking the "[n]o" box. (Cr.'s Ex. 1, at 42; UST's Ex. 15, at 42). Similarly, in answering Question 5, "Did you receive any other income during this year or the two previous calendar years," Mr. Coffey responded by checking the "no" box. (Cr.'s Ex. 1, at 42; UST's Ex. 15, at 42). At trial, Mr. Coffey admitted that he was receiving monthly disability income of $5,100.00. This monthly income is reflected as the pension or retirement income in Mr. Coffey's Schedule I.

18

Mr. Coffey also responded "[n]o" to Question 27 asking whether, within four years of filing for bankruptcy, Mr. Coffey owned "a business or [had] any . . . connections to any business" such as "sole proprietor or self-employed," "member," "partner," "officer, director, or managing executive" or "owner of at least 5% of the voting or equity securities of a corporation." (Cr.'s Ex. 1, at 51; UST's Ex. 15, at 51).

Mr. Coffey's case was converted to a Chapter 7 case on June 2, 2017. On June 5, 2017, A. Jan Thomas, Jr., was appointed as the Chapter 7 trustee in the case (the "**Chapter 7 Trustee**"). The first meeting of creditors was scheduled for July 14, 2017. After that date, the docket sheet reflects that the Chapter 7 Trustee requested a notice of assets be sent to creditors and the first meeting was continued to September 1, 2017. The docket sheet reflects that Mr. Coffey did not appear at the first meeting scheduled for September 1, 2017, and the first meeting was continued to October 13, 2017.

### B. Issues Arising from Requests for Production of Documents – Current Case

On August 16, 2017, CNR and the Chapter 7 Trustee filed a pleading titled, "*Joint Motion for Order Authorizing Examination and Subpoenas Duces Tecum Pursuant to Rule 2004(a) and Federal Rules of Civil Procedure Rule 30*." (Cr.'s Ex. 31, at 1). An order was entered granting the joint motion on August 21, 2017. Mr. Coffey filed a motion to quash the subpoena and sought a protective order. The Court held a hearing on the motion to quash and for protective order on September 7, 2017, and, at the conclusion of the hearing, the motion to quash was denied. Mr. Coffey was ordered to produce the documents requested in paragraphs "b" through "q" in the subpoena duces tecum issued by CNR and the Chapter 7 Trustee. The Court granted Mr. Coffey's request for a protective order but took the scope of the protection under advisement.

19

On September 18, 2017, the Court entered its order on the scope of the protective order

stating, in part:

> The Debtor supports his request for a protective order with two allegations. The first is that the proposed examination and production of documents is sought for the purpose of harassment. The second is that the real reason for the examination and document production is to provide the information to an individual or individuals connected with CNR Holdings who will use it to further defraud the Debtor.

> As to the first allegation, the Court sees no evidence of harassment in the request for documents. In fact, many if not all of the requests stem from inconsistencies and omissions in the Debtor's schedules and statement of financial affairs and the uncooperative nature of the Debtor's testimony at his 341(a) meeting of creditors. The Court agrees with the proponents of the Motion for 2004 examination that every document request recites a legitimate purpose.

> As to the second allegation, the Court first observes that the material requested is neither privileged, proprietary, nor confidential under Federal Rule of Bankruptcy Procedure 9016 and Federal Rule of Civil Procedure 45. By the Debtor's own admission, several of the documents are a matter of public record that can be independently procured by any party without judicial involvement. Furthermore, the parties have not agreed to a protective order, as is often the case when such an order is imposed.

> The Debtor did not introduce specific evidence to support his contention that he will be defrauded by one or more individual members of CNR Holdings if he submits to the 2004 examination and produces the documents. Yet it is clear that the Debtor firmly believes that certain disclosures put him at risk. Additionally, the Court is aware that CNR has been granted relief from stay to pursue a quiet title action against the Debtor in Tennessee state court. The subject of the litigation is [the Maplewood Properties] that the Debtor claims to have been defrauded of by CNR or its individual members.

> This state of affairs has resulted in such a level of distrust and animosity between the parties that it has the potential to impede any progress in the case, particularly regarding the Debtor's disclosure of needed information. In an attempt to dispel the Debtor's distrust and instill a spirit of cooperation, the Court grants the following limited protective order. The documents requested by the Trustee, labeled 'b' through 'q' in the joint motion, will be submitted by the Debtor at the 2004 examination. The Trustee, CNR Holdings, and counsel may view these documents at that time. After the examination, these documents will be kept on file in the Trustee's office where parties in interest in this bankruptcy case may view them. Except as to any document on file in the public records, the documents may only be used in connection with proceedings conducted in the course of this bankruptcy case. When the case is closed, the documents will be returned to the Debtor, and a certification that the return has been effected will be

filed on the court docket by the Trustee.  The aim is that the Debtor can feel confident CNR is not using Rule 2004 to provide discovery for the quiet title action or any other action before another tribunal, which is not a permitted use of the Rule.  *See, e.g., In re Coffee Cupboard, Inc.,* 128 B.R. 509, 516 (Bankr. E.D.N.Y. 1991)(observing that Rule 2004 should not be used to obtain information for use in an unrelated case or proceeding pending before another tribunal).  However, the "mere fact that there is pending litigation against a person sought to be examined under Rule 2004 and possible use of such testimony in collateral litigation is not a sufficient reason for denying the examination."  *Id*.  The Court's instruction should not be construed as restricting a party from conducting discovery in connection with litigation pending before another tribunal when the discovery conforms to the tribunal's rules.

The transcript of the Rule 2004 examination and the documents produced pursuant to the subpoenas *duces tecum* will not be placed under seal as requested by the Debtor as such documents are not required to be filed with the Court under the Rule.

In all other respects, the Debtor shall conform to the Rule by submitting to examination by CNR and the Trustee and by delivering the requested documents to the Trustee and the tax returns to CNR, unless, as the Debtor contends, he has not filed tax returns for the designated years.

(Cr.'s Ex. 31, at 2–4).

On September 27, 2017, CNR and the Chapter 7 Trustee filed an *Amended Notice of Rule 2004 Examination with Subpoena Duces Tecum Pursuant to Court Order*.  The notice set October 13, 2017, as a date for a 2004 examination of Mr. Coffey and contained seventeen paragraphs (identified as "a" through "q") identifying documents to be produced by Mr. Coffey at the 2004 examination on October 13, 2017 (the "**October Exam**").

A transcript of the October Exam[1] was introduced into evidence.  Mr. Coffey was present, along with CNR's counsel, Jeanette Robertson, and the Chapter 7 Trustee.  At the beginning of the examination, Ms. Robertson stated:

Mr. Coffey, I'm Jeannette Robertson.  I represent CNR Holdings.  This deposition is being taken pursuant to Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy for Civil Procedure Rule 2004.  And pursuant to that [sic] those

---

[1] The cover of the transcript reflects the date of the October Exam as October 13, 2016, instead of the correct year, 2017.

laws and procedural rules, this deposition may be used in any and all legal forms and in any manner allowed by law.

(Cr.'s Ex. 30, at 5).

Mr. Coffey expressed some concern with this language and indicated he did not understand what "any and all legal forms" meant and asked for a clarification of Ms. Robertson's statements. (Cr.'s Ex. 30, at 5). After several comments back and forth, Mr. Coffey did begin answering some of Ms. Robertson's questions.

Among other things, Mr. Coffey testified at the October Exam that he owned Lesco Inc., and it did work for the government from 1998 until 2012. At the time of the October Exam, Lesco Inc., was no longer in existence. When it was first formed, Mr. Coffey owned 100% of Lesco Inc., but the ownership was later divided a few times. Mr. Coffey was not sure when Lesco Inc., was dissolved, but stated he thought the company was dissolved in 2008. Later in the deposition, Ms. Robertson introduced a copy of this Court's order entered September 18, 2017, granting Mr. Coffey's request for a protective order. In reviewing the order, Mr. Coffey noted that the provisions of the protective order restricted the use of the documents produced at the October Exam. Mr. Coffey and Ms. Robertson disagreed over the appropriate use of his testimony at the October Exam. Mr. Coffey began asserting his Fifth Amendment privilege in response to Ms. Robertson's questions. After several questions, Ms. Robertson stated she would go through the documents Mr. Coffey brought with him in a box to the October Exam. Mr. Coffey stated, "I'm going to look through the box too, because I haven't even seen what's in it. I don't even know what's in that box. I brought every document that I had in my possession. I don't even know what's in there." (Cr.'s Ex. 30, at 76).

The parties began going through the documents in the box but continued to argue about the scope of the protective order and how the documents could be used. At this point the

22

Chapter 7 Trustee began asking questions. Mr. Coffey did respond to a few of his questions, until an issue with Mr. Coffey's driver's license arose. The Chapter 7 Trustee asked Mr. Coffey if he would let him look at his driver's license, and Mr. Coffey responded stating he did not "have a problem with [the Chapter 7 Trustee] looking at [his] driver's license," but that he was "not going to consent to [the Chapter 7 Trustee] writing any information down off of" the license. (Cr.'s Ex. 30, at 102). Mr. Coffey then handed the Chapter 7 Trustee an Arkansas driver's license, and the Chapter 7 Trustee began reading the license number into the record. Counsel for CNR wrote the number down, and Mr. Coffey called for the "Bailiff." (Cr.'s Ex. 30, at 102). Without summarizing the numerous pages in the deposition disclosing the disruption caused by the driver's license number being disclosed, it is sufficient to state that the October Exam ended. Mr. Coffey left and then filed a criminal complaint for invasion of privacy or identify theft against Ms. Robertson and the Chapter 7 Trustee. No warrants were ever issued on the charges.

After the October Exam, CNR and the Chapter 7 Trustee filed a joint motion for contempt and award of sanctions against Mr. Coffey. On January 10, 2018, after a hearing on the joint motion, the Court entered its order denying the joint motion on conditions. The order found as follows:

> [T]he Debtor did act in contempt of this Court's order of September 18, 2017 (Document #242) in failing to produce the documents set forth in the Subpoena Duces Tecum at the scheduled deposition, failing to take reasonable steps to obtain and produce said documents, failing to properly respond to deposition questions and failing to complete the deposition without cause; as such, the Court has ordered the Debtor to produce the subpoenaed documents at the offices of A. Jan Thomas, standing Chapter 7 Trustee for this case no later than noon (12:00 p.m.), Friday, January 12, 2018 to purge himself of contempt. In the event the Debtor fails to produce the documents subpoenaed and by the deadline noted herein, A. Jan Thomas shall immediately inform the Court and the Court will issue an Order to Show Cause why the Debtor should not be held in contempt and be sanctioned.

23

(Cr.'s Ex. 32).

Ms. Kimery, a legal assistant for the Chapter 7 Trustee during the time the Chapter 7 Trustee was assigned to Mr. Coffey's case, testified on behalf of CNR and the UST.[2] Ms. Kimery was familiar with the box of documents Mr. Coffey produced at the October Exam. With the exception of a black notebook containing worker's compensation documents, the documents were in disarray. The documents were not in any type of order and even included junk mail. Ms. Kimery testified that the documents were in the same state of disarray on the day of the trial as they were when she first saw them in the Chapter 7 Trustee's office. At no time did Mr. Coffey organize the documents by the categories listed in the subpoena duces tecum.

Ms. Kimery testified that Mr. Coffey did visit the Chapter 7 Trustee's office around January 25, 2018, but he did not produce any additional documents during that visit. In fact, Ms. Kimery testified that no additional documents were provided to the Chapter 7 Trustee after that date. It was Ms. Kimery's testimony that the box of documents did not contain any State Farm Insurance ("**State Farm**") policies.

In response to questions by the UST's attorney, Ms. Kimery testified that Mr. Coffey did not fully cooperate with the Chapter 7 Trustee and did not fully comply with requests for documents and financial records that the Chapter 7 Trustee made to Mr. Coffey. Also, according to Ms. Kimery, Mr. Coffey did not timely provide documents and financial information to the Chapter 7 Trustee pursuant to the Court's order.

On January 23, 2018, CNR and the Chapter 7 Trustee filed a joint motion for contempt to request order to show cause against Mr. Coffey. The Court issued an order to show cause and a hearing was held on the order to show cause on June 7, 2018. The Court entered its ruling on

---

[2] A. Jan Thomas died on December 21, 2021. Ms. Kimery was Mr. Thomas's legal assistant the entire time he was assigned to handle Mr. Coffey's bankruptcy case as his Chapter 7 Trustee.

June 14, 2018 (the "**OSC Order**"), and held Mr. Coffey in contempt for not producing "various documents requested by the [Chapter 7] Trustee and CNR and as ordered by this Court" and awarded the joint movants attorney fees and costs related to the October Exam.  (Cr.'s Ex. 33, at 2).  The OSC Order found "that the Debtor is in contempt for failing to turn over the requested documents, properly respond to deposition questions, and complete the deposition."  (Cr.'s Ex. 33, at 2).

The OSC Order ordered Mr. Coffey to produce certain documents listed in the order within fourteen days of the entry of the order.  He was to deliver the documents to the Chapter 7 Trustee's office and organize them in separate folders in categories correlating to paragraphs "b" through "q" in the subpoena.  In the event Mr. Coffey determined that the documents did not exist, or that he was unable to obtain the documents despite reasonable efforts to do so, he was ordered to file with the Court a sworn affidavit stating the reasons for not producing such documents.  As stated in the OSC Order, the documents Ms. Coffey was to produce included the following:

(b) Family Trust.

. . . .

[A] copy of the document from the real estate records in Poinsett County, Arkansas, showing the ownership of the Debtor's residence at 737 Westwood Drive, Trumann, Arkansas . . . .

(c) Documents supporting Debtor's Schedule I.

. . . .

. . . [A] copy of the insurance policy and the claim filed by the Debtor with State Farm Insurance that supports the Debtor's statements that the source of his income is because of a disability.

(d) Railroad leases.

. . . [C]opies of the railroad leases and assignments relevant to this request.

. . .[D]ocuments evidencing any correspondence or litigation to demonstrate the Debtor's collection efforts regarding the leases.

(e) Debtor's bank accounts.

. . . [C]opies of bank statements for any bank account the Debtor uses to cash or deposit his income payments from his disability policy and copies [of] bank statements for accounts upon which he is a signatory.   Statements are requested for the six month period prior to the subpoena date.

. . . .

(g) Fifty-four claims against various parties.

. . . [A]dditional information concerning each claim listed in his Schedule A/B . . . [including] the nature of the claim, the estimated amount of the claim, the date the claim accrued, the date the last payment on the claim was made, and other evidence of the claim including any other documents to substantiate the claim.

Such information is needed even if the Debtor believes the claim has expired or is not valuable to the estate.

. . . .

(m) Documentation as to property owned by another which is in the Debtor's control.

. . . .

. . . [A] copy of the order of the administrative law judge in the worker's compensation case finding that the Debtor is an "employee" of Rossville Metal[], not a manager.

(Cr.'s Ex. 33, at 4–7).

Mr. Coffey requested an extension of time to comply with the Court's deadline to complete document production, and the Court entered an order granting the motion extending the time to September 12, 2018.[3]  The order also made the following findings:

---

[3] The Court took judicial notice of this order at the close of the trial.

[The OSC Order] makes clear that the Debtor must make reasonable efforts to acquire all the documents listed and keep a record of the efforts he has made in that regard. Much of his research can be done without the necessity of travel. He should retain copies of letters he has written or received, emails he has sent and received, or notes of phone calls he has made and received if they pertain to the production of the requested documents. This record can be used to demonstrate to the Court that the Debtor has made reasonable efforts to obtain the documents he has been ordered to produce.

The Court reminds the Debtor that many of these documents were requested because they relate to property with some value, according to the Debtor's own statements in open court or in pleadings.

(Case No. 3:16-bk-16337, Doc. No. 369).

The documents were not produced by the extended deadline and CNR filed a motion for contempt and for issuance of an order to show cause against Mr. Coffey and for sanctions for continuing to fail to produce the subpoenaed documents. On June 24, 2020, a telephonic hearing[4] was held on CNR's motion for contempt and issuance of order to show cause against Mr. Coffey and for sanctions for continuing to fail to produce the subpoenaed documents (the "**Final Contempt Hearing**"). (Cr.'s Ex. 34). Mr. Coffey appeared at the Final Contempt Hearing, pro se, and presented testimony concerning the production of documents. No other testimony was presented. Mr. Coffey testified that he had either produced the requested documents or the documents could not be located or did not exist.

When Mr. Coffey was asked at trial whether he had complied with the OSC Order by timely filing an affidavit stating the reasons for not producing certain documents, he stated, "I don't think I ever did an affidavit." (Tr. at 323). However, he went on to testify at trial that after he became aware of the affidavit requirement at the Final Contempt Hearing, he did attempt to comply with that part of the order.

---

[4] Due to the Covid-19 pandemic, the hearing was held telephonically.

At trial, Mr. Coffey was examined by CNR and the UST about his continued failure to produce certain documents. The testimony from the Final Contempt Hearing and the trial are summarized together below.

### (1) Ownership Records for the Trumann Property

As indicated above, Mr. Coffey was ordered to produce "a copy of the document from the real estate records in Poinsett County, Arkansas, showing the ownership of the Debtor's residence at [the Trumann Property]." (Cr.'s Ex. 33, at 4). At the trial, Ms. Kimery testified that Mr. Coffey did not produce a copy of the Trumann Property deed to the Chapter 7 Trustee. Mr. Coffey testified at the Final Contempt Hearing that this property belonged to his mother, and he stated, "I don't own—I have no ownership interest in that house." (Cr.'s Ex. 34, at 49). He testified that at some point he "went over to the courthouse and got the deed record and sent it to [the Chapter 7 Trustee]." (Cr.'s Ex. 34, at 49). Mr. Coffey stated again during the trial that he did not know of any interest he had in this property. CNR and the UST introduced evidence to the contrary. Both parties introduced a warranty deed filed in the Poinsett County, Arkansas, real estate records on August 15, 2003, transferring the Trumann Property to seven persons, including Mr. Coffey, subject to a life estate reserved for Martha A. Lakey, Mr. Coffey's mother. Mr. Coffey testified that he had never seen this document before. Mr. Coffey stated that he did not know this deed existed, so he did not "even know to go look for it." (Tr. at 621).

When questioned about his statement at the Final Contempt Hearing that he had provided a copy of the deed to the Trumann Property to the Chapter 7 Trustee, Mr. Coffey denied making the statement. On cross examination by CNR's counsel, when asked again about producing the deed to the Trumann Property, he testified that he "never even remotely even thought about

the . . . physical deed . . . [he] thought . . . [CNR and the Chapter 7 Trustee] were looking for . . . proof of ownership." (Tr. at 778).

CNR and the UST introduced a copy of the assessor's records for the Trumann Property. The sales history on the record reflects an entry with "M Lakey Life" as the grantor. (Cr.'s Ex. 36, at 2; UST's Ex. 30, at 2). After reviewing the assessor's records, Mr. Coffey stated that this document is probably what he gave to the Chapter 7 Trustee. During his case-in-chief, Mr. Coffey introduced into evidence the Poinsett County paid tax receipts for the Trumann Property for 2015 through 2020, reflecting the owner of the property as his mother, Martha Ford Lakey, and reflecting that the tax payment was received by Martha Lakey. He testified that "[t]hese documents, or some similar to them" were what he provided to the Chapter 7 Trustee and were what he "thought at the time was proof that she owned the house." (Tr. at 759).

### (2) State Farm Disability Policy

Mr. Coffey was ordered to produce "a copy of the insurance policy and the claim filed by the Debtor with State Farm Insurance that supports the Debtor's statements that the source of his income is because of a disability." (Cr.'s Ex. 33, at 4–5). Mr. Coffey testified at the Final Contempt Hearing that he produced the policy to the Chapter 7 Trustee and stated that, in fact, the policy was one of the documents in the box that was produced at the October Exam. He further testified there was no physical claim made on the policy to be produced, he just contacted State Farm to let them know he may have a claim. At the Final Contempt Hearing, Mr. Coffey also stated that he provided the Chapter 7 Trustee with explanations of benefits for the policy and correspondence from State Farm regarding the claim.

At trial, CNR introduced a copy of a letter dated April 17, 2013, from State Farm to Mr. Coffey, which provided an update on the status of his disability insurance claim. The date of

loss is reflected on the letter as August 1, 2012. The letter included an explanation of benefits reflecting $5,100.00 being paid for total disability benefits for the period from March 28, 2013 to April 28, 2013, and requested additional information for additional benefits to be considered. The letter was addressed to Mr. Coffey at the Maplewood Properties address. When asked if he was residing at the Maplewood Properties address in April 2013, Mr. Coffey stated he was not. Instead, he stated he was living with his mother in Trumann, Arkansas. Mr. Coffey testified that he began receiving $5,100.00 per month after an exclusion period expired and has continued to receive that amount monthly through the trial date.

At trial, contrary to his testimony at the Final Contempt Hearing, Mr. Coffey testified that he knew he provided at least the "dec page" for the policy to the Chapter 7 Trustee. (Tr. at 435). He testified, however, that he "never provided the policy, because [he] never obtained that." (Tr. at 614). On Mr. Coffey's cross examination, he pointed out that the April 17, 2013 letter he produced to CNR is proof that he provided the Chapter 7 Trustee with the policy number and the claim number for the disability insurance claim. During his case-in-chief, Mr. Coffey introduced a copy of a two-page document from State Farm that stated it was providing Mr. Coffey with a copy of the policy; his application for review; and a policy schedule with the policy number, effective date, and coverage information. His exhibit did not include the policy itself. He testified that the two-page document was "the exact document[] that [he] gave to [the Chapter 7 Trustee] at some point." (Tr. at 733). Ms. Kimery testified that, in reviewing the documents, she never saw a State Farm policy.

### (3) Account Statements

Mr. Coffey was also ordered to produce "copies of bank statements for any bank account the Debtor uses to cash or deposit his income payments from his disability policy and copies [of]

bank statements for accounts upon which he is a signatory . . . for the six month period prior to the subpoena date."  (Cr.'s Ex. 33, at 5).

Mr. Coffey was asked about his account statements for his E-trade and Scottrade accounts at the Final Contempt Hearing.  As to the E-trade account, Mr. Coffey testified he did not believe it was in existence in 2016 when he filed bankruptcy.  He acknowledged having a Scottrade account, but testified that he did not have any money in it.  He then stated he did not produce bank statements for the accounts because they did not exist, and that he "wouldn't even know where to go to look" to obtain electronic statements. (Cr.'s Ex. 34, at 60).  Testimony and documentary evidence were introduced at trial regarding both the E-trade account and the Scottrade account.  As stated above, Mr. Coffey admitted that, based on CNR's exhibits, "there's a probability" that he had a Scottrade account on the petition date.  (Tr. at 432).  No evidence was produced to show that any statements for the account were ever provided to the Chapter 7 Trustee.

### (4)  Information Concerning Possible Claims

Mr. Coffey was also ordered to produce:

[A]dditional information concerning each claim listed in his Schedule A/B . . . [including] the nature of the claim, the estimated amount of the claim, the date the claim accrued, the date the last payment on the claim was made, and other evidence of the claim including any other documents to substantiate the claim.

(Cr.'s Ex. 33, at 5–6).

At trial, CNR'S counsel questioned Mr. Coffey about the additional information he was to produce concerning each claim listed in his Schedule A/B.  Mr. Coffey testified that he sent the Chapter 7 Trustee an email with information about the various claims.  A four-page email was introduced into evidence from Mr. Coffey to the Chapter 7 Trustee dated September 27,

2017, describing the claims.  Mr. Coffey testified that he believed the Chapter 7 Trustee was satisfied with the information he received on the claims.

The OSC Order, entered after Mr. Coffey's email to the Chapter 7 Trustee, ordered Mr. Coffey to provide additional information concerning the claims.  The September 27, 2017, email did not include the information required by the OSC Order.  No other evidence was introduced to show that the additional information was provided as required.

### (5)  *Rossville Metal Ownership Information*

Mr. Coffey was also ordered to produce "a copy of the order of the administrative law judge in the worker's compensation case finding that the Debtor is an "employee" of Rossville Metal[], not a manager."  (Cr.'s Ex. 33, at 7).

Ms. Kimery testified that Mr. Coffey never produced any documents to explain the ownership of Rossville Metal.  At trial, Mr. Coffey testified that he has never had an ownership interest in Rossville Metal.  Mr. Coffey testified that originally the owners of Rossville Metal were Jill Coffey, holding thirty percent ownership, and a trust established for his children (the "**Children's Trust**"),[5] holding seventy percent ownership.  Mr. Coffey insisted he never had an interest in Rossville Metal, and that he was not the sole member of Rossville Metal before the Children's Trust was formed.

CNR introduced a business search from the State of Georgia's corporations division for Rossville Metal.  The search result reflects that Rossville Metal was formed on August 13, 2008, and was administratively dissolved on September 6, 2012.  The result also reflects that the last annual registration for Rossville Metal was filed on February 5, 2010.  The principal office

---

[5] Throughout Mr. Coffey's testimony, he referred to the Children's Trust as a trust established for his four minor daughters.

address is listed as the post office box in Lookout Mountain, Tennessee.  Mr. Coffey is listed as

the registered agent with a physical address of 555 McFarland Avenue, Rossville, Georgia.

A certificate of organization for Rossville Metal issued by the State of Georgia was

introduced reflecting that Rossville Metal was organized under the laws of the State of Georgia

on August 13, 2008.  The articles of organization were also introduced and reflect the following

information:

> The name of the Limited Liability Company is:
> Rossville Metal Recyclers LLC
>
> The principal mailing address of the Limited Liability Company is:
> P.O. Box 242
> Lookout Mountain, TN 37350
>
> The Registered Agent is:
> Leslie D Coffey
> 555 McFarland Ave
> Rossville, GA  37401
> County: Walker
>
> The name and address of each organizer(s) are:
> Lelsie [sic] D Coffey
> 555 McFarland Ave, Box 10
> Rossville, GA  37401
>
> The optional provisions are:
> No optional provisions.
>
> IN WITNESS WHEREOF, the undersigned has executed these Articles of
> Organization on the date set forth below.
>
> Signature(s):                               Date:
> Member/Manager, Leslie D. Coffey            August 13, 2008

(Cr.'s Ex. 10, at 4; UST's Ex. 39, at 2).

At the October Exam, Mr. Coffey testified that he had never listed himself as an owner/

officer of Rossville Metal.  He also testified that he did not prepare the paperwork to "file for

Rossville Metals Recyclers, LLC in Tennessee."  (Cr.'s Ex. 30, at 33).  As stated above,

Rossville Metal was organized in Georgia so the answer "no" could have related to the fact that no paperwork was prepared for filing in Tennessee.

At trial, Mr. Coffey was asked about the articles of organization for Rossville Metal, and he denied that he was a member/manager of Rossville Metal. He stated that the online form does not have choices for positions and that "member/manager" selection was the only choice for him to select. During his own cross examination, he admitted that the articles of organization have been scrutinized a lot by both the worker's compensation carrier and the Chapter 7 Trustee. He was adamant that when you go online to register an organization, or to renew your registration, the online system does not allow you to pick manager only, the only choice is "member/manager."

As previously stated, Rossville Metal was not originally listed in the schedules or SOFA in the 2008 Case; however, on December 8, 2008, Mr. Coffey amended his SOFA to add Rossville Metal, although the amendment did not state his position or his interest in the company. At the October Exam, Mr. Coffey stated that he started Rossville Metal in 2008 and it was owned by his daughters, Leslie Nicole Coffey, Faith Elizabeth Coffey, Caroline Anne Coffey, and Martha Marie Coffey, and Dana Jill Coffey, his wife. (Cr.'s Ex. 30, at 29–30). He also testified that he was an employee of Rossville Metal and not an officer. When questioned about his interest in Rossville Metal by the UST's attorney, Mr. Coffey was adamant that he has never been an owner of Rossville Metal and has "never done any business in [his]—even in a sole proprietorship or individual capacity as Rossville Metal[]." (Tr. at 409).

As stated above, Mr. Coffey filed a Chapter 11 bankruptcy petition as Owner/Manager of Peerless Storage, and he provided information to Peerless Storage's attorney to assist him in the preparation of the petition and schedules. A motion to sell certain assets was filed in the Peerless

34

Chapter 11 case on March 11, 2011.  The motion stated, "Rossville Metals Recyclers, LLC [was] an entity owned by Les Coffey, principal of [Peerless Storage]."  (Cr.'s Ex. 48, at 3; UST's Ex. 20, at 3).  Mr. Coffey testified that Peerless Storage's attorney must have assumed he was the owner of Rossville Metal, but that he never told anyone he owned Rossville Metal.

During his case-in-chief, Mr. Coffey introduced a copy of the operating agreement of Rossville Metal (the "**Operating Agreement**") dated April 8, 2018, which he described as the latest operating agreement.  The Operating Agreement denotes Leslie Nicole Coffey and Jill Coffey as the managers of Rossville Metal and lists the ownership interest in Rossville Metal as follows:

|                        |       |
| ---------------------- | ----- |
| Leslie Nicole Coffey   | 35%   |
| Faith Elizabeth Coffey | 17.5% |
| Dana Jill Coffey       | 17.5% |
| Martha Marie Coffey    | 15%   |
| Caroline Anne Coffey   | 15%   |

(Debtor's Ex. 1, at 4).  According to the Operating Agreement, the company was originally formed on August 13, 2008, and the Operating Agreement introduced into evidence is the first "reorganization of the entity . . . to include the adult children of Leslie D. Coffey whom held previous ownership through a trust."  (Debtor's Ex. 1, at 4).

Also introduced into evidence by Mr. Coffey was a copy of minutes from a meeting of the members of Rossville Metal held April 6, 2018.  Present were "Dana Jill Coffey, the manager, and owner of 30% stake in the entity" and Leslie D. Coffey who was present "on behalf of the 4 children whom are the beneficiaries of the trust."  (Debtor's Ex. 1, at 25).  The minutes also state that "[p]rior to the meeting the children owned 70% of Rossville Metal[] through the trust."  (Debtor's Ex. 1, at 25).  At trial, Mr. Coffey testified that the children chose to close the company a "couple of years" ago.  (Tr. at 728).

In addition, Mr. Coffey introduced a copy of an interlocutory order (the "**Interlocutory Order**") issued by the State of Wisconsin, Labor and Industry Review Commission (the "**Commission**"), on September 30, 2019, in a claim filed by Leslie D. Coffey as applicant, Rossville Metal as employer, and Middlesex Insurance Co. as insurer.[6]  The order makes certain findings of facts, including that in 2012, when Rossville Metal was applying for worker's compensation coverage, Mr. Coffey objected to an increase in the premium based on the carrier's misunderstanding that he was seeking coverage for himself as a member of Rossville Metal. Mr. Coffey objected to this increase "on the basis that . . . he was only the trustee for his minor children's 70% ownership interest in Rossville, with his wife possessing the other 30% ownership interest."  (Debtor's Ex. 2, at 4).  Mr. Coffey introduced a partial email chain between himself and the insurance agent working on the worker's compensation coverage.  In the email exchanges, the agent is seeking to confirm that Jill Coffey is the only member of Rossville Metal.  Mr. Coffey informs the agent, "[Jill Coffey] is the managing member. The main member is the girls [sic] trust."  (Debtor's Ex. 8, at 2).

The Interlocutory Order concluded that Mr. Coffey was a "non-member employee of Rossville Metal" based partially on an operating agreement of Rossville Metal with an effective date of October 15, 2009, listing the Children's Trust as having a 70% ownership interest and Jill Coffey as having a 30% ownership interest.  (Debtor's Ex. 2, at 5).  In discussing the operating agreement, the Commission stated, "The document is in accord with Coffey's consistent testimony regarding the true ownership of Rossville, and his true role as trustee for his children's

---

[6] Once again, in August 2012, Mr. Coffey was working for Rossville Metal cleaning out a warehouse in Wisconsin when he was injured and broke his back in three places.  He filed a claim for worker's compensation and drew worker's compensation payments in August, September, October, and November 2012.  At that point, the worker's compensation payments stopped with the carrier taking the position that "under Wisconsin law an owner had to actually accept coverage" to be covered by the policy.  (Tr. at 603).  Appeals of the decision ensued, resulting in the entry of the Interlocutory Order by the Commission on September 30, 2019.

member status in that LLC.  The document is credible and determinative of Coffey's personal

non-membership status at the time of the worker's compensation insurance application."

(Debtor's Ex. 2, at 5).

Consistent with the findings in the Interlocutory Order, Mr. Coffey also introduced a

confidential request for information provided as part of the worker's compensation claim.  The

first page of the handwritten form is dated August 13, 2012.  The second page of the form lists

the ownership interests of Rossville Metal as: "Dana Jill Coffey 30% [and] Trust for minor

children of Leslie D. Coffey 70%."  (Debtor's Ex. 7, at 2).  The page with the ownership

information is not dated or signed.

### III.  ARGUMENTS

As stated above, both complaints contained six causes of action.  The parties' arguments

for each count are discussed generally below.

#### A.  <u>Section 727(a)(2)(A) – Transfer or Concealment of Property</u>

In their complaints, CNR and the UST assert Mr. Coffey's discharge should be denied

because he transferred or concealed his ownership interest in various assets with the intent to

hinder, delay, or defraud creditors or the Chapter 7 Trustee.  Mr. Coffey denies these allegations

and claims he made a complete disclosure of his assets.  He asserts CNR's and the UST's

allegations that he held an ownership interest in additional assets within the relevant period prior

to filing are simply incorrect.

#### B.  <u>Section 727(a)(3) – Concealment of Recorded Information</u>

CNR and the UST next assert Mr. Coffey's discharge should be denied because he has

persistently failed to provide requested documentation to the parties in the case.  When these

requests failed, CNR asserts it was forced to file multiple motions with the Court in an attempt to

obtain Mr. Coffey's compliance.  Mr. Coffey asserts he provided every document that he had in

his possession to the Chapter 7 Trustee.  As to the documents he could not provide, Mr. Coffey asserts the requests were unreasonable, as they involved the production of documents that were from well before the filing of his bankruptcy case.

### C.  <u>Section 727(a)(4)(A) – False Oaths</u>

CNR contends that Mr. Coffey made false oaths in his schedules, in his statement of financial affairs, in deposition testimony, and in testimony presented to the Court during hearings.  The UST asserts Mr. Coffey failed to disclose in his schedules his ownership interest in material assets or his transfer of those assets prior to the bankruptcy case.  Although Mr. Coffey admits that he made some mistakes in filling out his bankruptcy petition and schedules, he asserts that these mistakes do not constitute false oaths.

### D.  <u>Section 727(a)(4)(D) – Withholding Recorded Information from Officer</u>

CNR and the UST assert that Mr. Coffey has consistently failed to produce documents requested by CNR and the Chapter 7 Trustee.  They contend this is cause for the Court to deny Mr. Coffey's discharge pursuant to Section 727(a)(4)(D).  In response to these allegations, Mr. Coffey argues that he provided all requested information to the Chapter 7 Trustee.

### E.  <u>Section 727(a)(5) – Failure to Explain Loss or Deficiency of Assets</u>

To support their claim that Mr. Coffey has failed to satisfactorily explain a loss or diminution of assets, CNR and the UST argue the Court must consider schedules filed in Mr. Coffey's previous bankruptcy cases.  In these previous cases, CNR and the UST assert that Mr. Coffey listed ownership interests and assets totaling nearly six million dollars.  Because these assets have not been listed in the Current Case, and, according to CNR and the UST, no explanation has been given regarding the loss of these assets, they argue Mr. Coffey's discharge should be denied.

In response to these allegations, Mr. Coffey admits that there has been a substantial loss of assets but contends he has provided a credible explanation for the loss. He asserts that neither CNR nor the UST ever inquired about the disposition of the assets. He also contends that during the trial, he accounted for every asset that was included in his earlier bankruptcy cases.

### F.  727(a)(6)(A) – Failure to Obey Court Orders

CNR and the UST finally assert that Mr. Coffey's discharge should be denied for failing to obey numerous orders issued by the Court. In response to these assertions, Mr. Coffey argues that he has complied with the Court's orders to the best of his abilities.

### G.  Other Relief Requested by CNR

In addition to the six causes of action listed above, CNR also requests that the Court bar Mr. Coffey from filing another bankruptcy case for a period of at least eight years, refer Mr. Coffey to the United States Attorney's Office for an investigation of possible bankruptcy fraud, and award CNR its attorney fees and costs in this action.

### IV.  DISCUSSION

The Court must now decide whether CNR and the UST have met their burden of showing that Mr. Coffey's discharge should be denied. As courts have widely noted, "denying the debtor a discharge is a 'harsh and drastic penalty.'" *Korte v. Internal Revenue Serv. (In re Korte)*, 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001) (quoting *Am. Bank v. Ireland (In re Ireland)*, 49 B.R. 269, 271 n.1 (Bankr. W.D. Mo. 1985)). Considering this, causes of action under Section 727(a) are "strictly construed in favor of the debtor." *Id.* (quoting *Fox v. Schmit (In re Schmit)*, 71 B.R. 587, 589–90 (Bankr. D. Minn. 1987)). However, "an objecting party need only establish one ground to support a discretionary denial of discharge by the bankruptcy court." *Snyder v. Dykes*

*(In re Dykes)*, 954 F.3d 1157, 1162 (8th Cir. 2020) (citing *Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 901 (7th Cir. 2002)).

While CNR and the UST have each asserted six causes of action in their complaints, as discussed below, the Court finds that CNR and the UST have met their burden of proving that Mr. Coffey's discharge should be denied pursuant to Section 727(a)(4)(A) and 727(a)(6)(A). The Court will limit its ruling to discussing only these two causes of action, beginning with the latter. The Court will then discuss CNR's requests that Mr. Coffey be barred from refiling another bankruptcy case, referred to the United States Attorney's Office, and that CNR be awarded its attorney fees and costs.

## A. Section 727(a)(6)(A) – Failure to Obey Court Orders

CNR and the UST seek to have Mr. Coffey's discharge denied pursuant to Section 727(a)(6)(A). Under this section, a debtor's discharge is to be denied if "the debtor has refused, in the case . . . to obey any lawful order of the court." 11 U.S.C. § 727(a)(6)(A). To decide whether a debtor's discharge should be denied under Section 727(a)(6)(A), the court should only consider orders entered in the present case. *See First Neb. Bank v. Poppe (In re Poppe)*, No. A16-4019, 2017 WL 27924, at *2 (Bankr. D. Neb. Jan. 3, 2017) ("[T]he conduct warranting a denial of discharge [under Section 727(a)(6)(A)] must have occurred in the same case in which the debtor would otherwise be entitled to a discharge.").

"[T]he term 'lawful order of the court' refers to any command, direction, or instruction issued by a court which is permitted by law." *Sylvan Learning, Inc. v. Rich (In re Rich)*, No. A11-8073, 2013 WL 49809, at *2 (Bankr. D. Neb. Jan. 3, 2013) (quoting *Standiferd v. U.S. Tr. (In re Standiferd)*, 641 F.3d 1209, 1213 (10th Cir. 2011)). The type of orders contemplated by this section "clearly includes orders requiring the debtor to produce documents relating to his or

her financial condition." *Missouri ex rel. Nixon v. Foster (In re Foster)*, 335 B.R. 709, 716 (Bankr. W.D. Mo. 2006) (first citing *Block v. Moss (In re Moss)*, 258 B.R. 391, 404 (Bankr. W.D. Mo. 2001); and then citing *In re Robson*, 154 B.R. 536, 539–40 (Bankr. E.D. Ark. 1993)). To deny a debtor's discharge under this section, "the Court must find that the [debtor's] lack of compliance with the relevant court order was willful and intentional." *Id.* The objecting party "may meet this burden by showing that the debtor received the order in question and simply failed to comply with its terms." *LaBarge v. Ireland (In re Ireland)*, 325 B.R. 836, 838 (Bankr. E.D. Mo. 2005) (citing *Katz v. Araujo (In re Araujo)*, 292 B.R. 19, 24 (Bankr. D. Conn. 2003)).

If the objecting party meets its burden, the debtor then has "an obligation to explain his non-compliance." *Foster*, 335 B.R. at 716. "While an inability to comply with an order is a defense under § 727(a)(6), [d]ebtors must . . . show that they took reasonable efforts to attempt to comply with the order." *Fokkena v. Luttig (In re Luttig)*, No. 03-30020, 2004 WL 5852686, at *6 (Bankr. S.D. Iowa Sept. 8, 2004) (citing *Hunter v. Magack (In re Magack)*, 247 B.R. 406, 410 (Bankr. N.D. Ohio 1999)). In addition, "[S]ection 727(a)(6)(A) of the Bankruptcy Code permit[s] the bankruptcy court to predicate denial of discharge on an intentional contempt, even though the contempt may have been purged by the time the bankruptcy court enters its order denying the contemnor's discharge." *United States v. Dowell (In re Dowell)*, 82 B.R. 998, 1003 (Bankr. W.D. Mo. 1987).

### (1) Orders of the Court

CNR and the UST argue that Mr. Coffey's conduct in this case warrants a denial of his discharge, asserting that he willfully and intentionally failed to comply with this Court's orders regarding the production of documents.[7] The documents at issue were first requested by CNR

---

[7] At trial, the UST also argued that Mr. Coffey failed to obey lawful orders of the Court when he refused to sign an unedited *Consent and Authorization for Release and Access to Financial Information and Records Pursuant to 12*

and the Chapter 7 Trustee on August 16, 2017, in a pleading titled, "*Joint Motion for Order Authorizing Examination and Subpoenas Duces Tecum Pursuant to Rule 2004(a) and Federal Rules of Civil Procedure Rule 30*" (the "**Joint Motion**").  (Cr.'s Ex. 31, at 1).  The Joint Motion designated documents to be produced in paragraphs labeled "a" through "q."  Orders entered subsequent to this Joint Motion form the basis for CNR's and the UST's requests for the denial of Mr. Coffey's discharge and are discussed below.

> (a)   Order on Motion to Quash Subpoena, Issuance of Protective Order, and Discharge (Doc. No. 242, Entered September 18, 2017)

First, an order was entered granting the Joint Motion and requiring the production of the documents.  Two days later, Mr. Coffey filed a *Motion to Quash Subpoena, Issuance of a Protective Order, and Discharge Debtor* (the "**Motion to Quash**")*.*  A hearing was held on the Motion to Quash on September 7, 2017, and at the conclusion of the hearing, the portion of the motion seeking to quash the subpoena was denied.  The portion of the motion seeking a protective order was granted, and an order was entered on September 18, 2017, designating the terms of the protective order and ordering Mr. Coffey to produce the documents requested in paragraphs "b" through "q" at a scheduled 2004 examination (the "**Initial Order**").  The examination was to be held in Jonesboro, Arkansas, on October 13, 2017 (previously defined as the "**October Exam**").  Mr. Coffey testified at trial that he remembered the Court's oral ruling denying his request to quash the subpoena and did recall the order in which the Court granted the protective order.  Therefore, the Court finds that CNR and the UST have met their burden of proving that Mr. Coffey was aware of the Initial Order, which instructed Mr. Coffey to produce

---

*U.S.C. § 3404, the Right to Financial Privacy Act*.  Although the Court finds the UST's allegations meritorious, based on the overwhelming evidence introduced regarding Mr. Coffey's failure to produce required documents, the Court will limit its discussion to the latter issue.

certain documents.  The Court finds the Initial Order was sufficient to inform Mr. Coffey of what documents were to be produced.

> (b)  Order on CNR's and the Chapter 7 Trustee's Motion for Contempt and Sanctions Against Mr. Coffey (Doc. No. 290, Entered January 10, 2018)

Mr. Coffey did appear at the October Exam and produced numerous documents in a box. Mr. Coffey stated at the October Exam that he "brought every document" he had and was not aware of what was actually in the box.  The parties had disagreements concerning the scope and use of the testimony to be given at the October Exam, and Mr. Coffey began asserting his Fifth Amendment privilege in response to questions.

Following the October Exam, CNR and the Chapter 7 Trustee filed motion for contempt and requesting sanctions against Mr. Coffey (the "**Motion for Contempt**").  In their Motion for Contempt, CNR and the Chapter 7 Trustee alleged that Mr. Coffey failed to produce the subpoenaed documents[8] and failed to put the documents that were produced in any type of order.

The Court held a hearing on the Motion for Contempt and entered an order on January 10, 2018 (the "**Contempt Order**") finding, in part, as follows:

> [Mr. Coffey] did act in contempt of this Court's order of September 18, 2017 [the Initial Order] . . . in failing to produce the documents set forth in the Subpoena Duces Tecum at the scheduled [October Exam], failing to take reasonable steps to obtain and produce said documents, failing to properly respond to deposition questions and failing to complete the deposition without cause; as such, the Court has ordered [Mr. Coffey] to produce the subpoenaed documents at the offices of A. Jan Thomas, standing Chapter 7 Trustee for this case no later than noon (12:00 p.m.), Friday, January 12, 2018 to purge himself of contempt.  In the event [Mr. Coffey] fails to produce the documents subpoenaed and by the deadline noted herein, A. Jan Thomas shall immediately inform the Court and the Court will

---

[8] Following entry of the Initial Order, CNR and the Chapter 7 Trustee filed an *Amended Notice of Rule 2004 Examination with Subpoena Duces Tecum Pursuant to Court Order*.  (Cr.'s Ex. 29).  This document continued to label the requested documents in categories "a" through "q."  The "subpoenaed documents" refer to the documents first requested in paragraphs "a" through "q" of the Joint Motion and then labeled in paragraphs "a" through "q" of the amended pleading introduced as Creditor's Exhibit 29.

issue an Order to Show Cause why [Mr. Coffey] should not be held in contempt
and be sanctioned.

(Cr.'s Ex. 32).

Mr. Coffey did not dispute that he was aware of this Contempt Order, and the Contempt

Order clearly provided instructions to Mr. Coffey of what actions he should take to purge himself

of his contempt. Therefore, the Court finds that CNR and the UST have met their burden of

proving that Mr. Coffey was aware of the Contempt Order, which again instructed Mr. Coffey to

produce documents. The Court finds the Contempt Order was sufficient to inform Mr. Coffey of

what documents were to be produced.

(c)  Order on Order to Show Cause and for Sanctions Against Mr. Coffey
     (Doc. No. 360, Entered June 14, 2018)

On January 23, 2018, CNR and the Chapter 7 Trustee filed a joint motion requesting an

order to show cause against Mr. Coffey (the "**Show Cause Motion**"), alleging that, although

Mr. Coffey had produced a few pages of documents after entry of the Contempt Order, he failed

to purge himself of contempt. The Show Cause Motion requested that the Court issue an order to

show cause as to why sanctions should not be imposed against Mr. Coffey. The Court granted

the Show Cause Motion, issued an order to show cause (the "**OSC**"), and ultimately set a hearing

on the OSC for June 7, 2018.

After reviewing the evidence presented at the OSC hearing, the Court rendered an oral

ruling finding Mr. Coffey in contempt and imposing sanctions against him. The ruling was

memorialized by an order entered June 14, 2018 (previously defined as the "**OSC Order**"),

finding that Mr. Coffey had failed to purge himself of his contempt. The OSC Order also

discussed each of the subpoena paragraphs "b" through "q" and, as to several categories, again

ordered Mr. Coffey "to produce the documents . . . within 14 days after the date [the OSC] Order

44

is entered." (Cr.'s Ex. 33, at 3). The OSC Order further directed Mr. Coffey to "organize the documents in separate folders corresponding to the categories (b) through (q) outlined in the subpoena." (Cr.'s Ex. 33, at 3). Finally, the OSC Order imposed monetary sanctions against Mr. Coffey in favor of CNR and the Chapter 7 Trustee for Mr. Coffey's failure to obey this Court's Contempt Order.

Mr. Coffey was present for the oral ruling and does not dispute that he was aware of the OSC Order. Therefore, the Court finds that CNR and the UST have met their burden of proving that Mr. Coffey was aware of the OSC Order, which contained directives to Mr. Coffey to produce documents. The Court finds the OSC Order was sufficient to inform Mr. Coffey of what documents were to be produced and what actions were to be taken to organize the documents.

### (2)  Failure to Obey Orders of the Court

As stated above, CNR and the UST have met their burden of proving that Mr. Coffey was aware of the Initial Order, the Contempt Order, and the OSC Order; he knew the orders required him to produce certain documents; he knew what documents were to be produced; he knew the documents were to be organized in categories consistent with the subpoena; and, on numerous occasions, he simply refused to comply with the orders. Because Mr. Coffey did not comply with the Court's orders, the Court held Mr. Coffey in contempt on more than one occasion. Below is a summary of evidence supporting a finding that Mr. Coffey's failure to obey the Court's orders was willful and intentional.

### (a)  State Farm Disability Policy and Claim

In the OSC Order, as part of the documents to be produced in response to paragraph "c" of the subpoena, the Court directed Mr. Coffey to provide a copy of the insurance policy and a copy of the claim he filed with State Farm to support the statement in his bankruptcy schedules

that his $5,100.00 per month income was due to a disability.  (This policy will be referred to hereinafter as the "**State Farm Policy**").  Conflicting evidence was introduced as to the production of the State Farm Policy.

During its case-in-chief, CNR introduced a transcript from the June 24, 2020 Final Contempt Hearing.   During that hearing, Mr. Coffey testified, "I have, in fact, produced [the State Farm Policy], and not only did I produce it, it was one of the documents that was in the box [produced at the October Exam]."  (Cr.'s Ex. 34, at 52).  He further testified that the State Farm Policy "was actually in the original box" and he "went into [the Chapter 7 Trustee's] office, pulled that document out, and showed it to him, [and] said, 'Here it is.'"  (Cr.'s Ex. 34, at 52).  At trial, however, Mr. Coffey disputed this evidence and stated, "I never said that I sent anybody the actual policy."  (Tr. at 674).

Mr. Coffey's failure to produce the State Farm Policy was corroborated by Ms. Kimery, who testified that he did not produce the State Farm Policy to the Chapter 7 Trustee.  At trial, contrary to his testimony on June 24, 2020, Mr. Coffey testified that he "never obtained the policy itself."  (Tr. at 614).  Ironically, however, during his case-in-chief, Mr. Coffey introduced a copy of a two-page document from State Farm to him stating it was attaching a copy of the policy along with a copy of his application for review.  The policy was not included in the two-page document introduced at trial.  Although later admitting that he did not produce the actual policy, Mr. Coffey testified that he did produce a letter from State Farm with the policy number and the claim number for the disability insurance claim.  No evidence was presented as to any efforts Mr. Coffey had taken to acquire a copy of the State Farm Policy.

Mr. Coffey also testified at the Final Contempt Hearing concerning the production of the claim submitted to State Farm for disability payments.  When asked whether he produced a copy

of the claim, Mr. Coffey testified that he did not know if he ever filed a "formal claim," stating he just "contacted them." (Cr.'s Ex. 34, at 54). He further testified that "there was no physical claim;" rather, he simply sent "an e-mail . . . to the agent." (Cr.'s Ex. 34, at 54). He continued by testifying that he did not recall how he notified State Farm of his claim, but that he "contacted the agent in April of 2012 and said, 'I have a potential claim.' They said, 'Okay. Well, let us know as soon as you know.'" (Cr.'s Ex. 34, at 55). The Court finds the testimony that there was no documentation available to produce on his disability claim resulting in $5,100.00 per month in disability payments for several years to be disingenuous.

Based on the evidence presented at trial, the Court finds that Mr. Coffey's failure to produce the State Farm Policy and documents related to the claim was both willful and intentional. In testifying that the policy had previously been produced, the Court finds Mr. Coffey was aware that he was required to produce the State Farm Policy but failed to do so. In addition, he was aware of the OSC Order requiring him to produce a copy of both the policy and the claim filed with State Farm. Mr. Coffey offered no evidence to explain his noncompliance and offered no evidence to show what efforts he made to comply with the Court's OSC Order.

Based on the foregoing, the Court finds the evidence supports a finding that Mr. Coffey's discharge should be denied pursuant to Section 727(a)(6)(A).

(b)  Bank Account Statements

In the Initial Order, the Contempt Order, and the OSC Order, as part of the documents to be produced in response to paragraph "e," Mr. Coffey was ordered to produce statements for any bank accounts he used to cash or deposit income listed on Schedule I or for which he was an

47

authorized signatory.  The orders required Mr. Coffey to produce statements for the six-month period prior to the date of the subpoena.

Evidence was introduced regarding a Scottrade account associated with Mr. Coffey.  At the Final Contempt Hearing, Mr. Coffey was questioned about the account and acknowledged having a Scottrade account but testified that he did not have any money in it.  He then stated he did not produce statements for the account because they did not exist and then said as to electronic statements, he "wouldn't even know where to go to look."  (Cr.'s Ex. 34, at 60).

CNR and the UST introduced evidence of a Scottrade account with an account number ending in 7492.  The evidence was a letter to Mr. Coffey dated June 17, 2016, concerning a provisional credit notification for a disputed point of sale transaction.  In addition, CNR and the UST introduced a copy of a motion filed by Mr. Coffey in this case in May 2017, where Mr. Coffey asked the Court to find Paula Sue Coffey in contempt for garnishing a Scottrade account with an account number ending in 7424.  In that motion, the Debtor asserted, "The Scottrade account is not only a joint account, but one that has [his] disability monies and sole income deposited into it."  (Cr.'s Ex. 51, at 2; UST's Ex. 24, at 2).

Mr. Coffey admitted at trial that based on the exhibits, "there's a probability" that he had a Scottrade account on the petition date.  (Tr. at 432).  From the evidence presented at trial, it is clear to the Court that this Scottrade account was an account for which Mr. Coffey was required to provide statements.  However, no statements were produced.  Based on the foregoing, the Court finds that Mr. Coffey's failure to comply with the Initial Order, the Contempt Order, and the OSC Order by not producing the Scottrade statements was willful and intentional. Mr. Coffey offered no explanation for his noncompliance and presented no evidence to show any efforts he made to attempt to produce the statements.  Mr. Coffey's willful and intentional failure

to provide the statements, as ordered, supports a finding that Mr. Coffey's discharge should be denied pursuant to Section 727(a)(6)(A).

        (c) <u>List of Claims</u>

Mr. Coffey's bankruptcy schedules included a list of fifty-four "additional claims against other parties that have not been collected, litigated and or resolved." (Cr.'s Ex. 1, at 20; UST's Ex. 15, at 20). In the Initial Order and the Contempt Order, Mr. Coffey was ordered to produce documents responsive to paragraph "g," seeking any document he believed supported his claims against the entities listed on his schedules. In the OSC Order, Mr. Coffey was specifically ordered to provide the following information for each of these claims: "[T]he nature of the claim, the estimated amount of the claim, the date the claim accrued, the date the last payment on the claim was made, and other evidence of the claim including any other documents to substantiate the claim." (Cr.'s Ex. 33, at 5–6). The OSC Order further provided that "[s]uch information is needed even if [Mr. Coffey] believes the claim has expired or is not valuable to the estate." (Cr.'s Ex. 33, at 6).

Mr. Coffey does not dispute that he failed to produce documents supporting most of the claims. In fact, in an email dated September 27, 2017, Mr. Coffey stated, "I do not have a single document as most all the documents I had were destroyed in 2013 during the set out." (Cr.'s Ex. 46, at 3). He then added that he had "not bothered to re-collect [the documents] as [he] was waiting to see how things shook down everywhere." (Cr.'s Ex. 46, at 3). He then admitted the following in the email: "[T]he rail leases are public record in Walker County. The rail road [sic] I am sure will give you a copy too. The transcripts are on file in the clerks [sic] office. Almost everything of any good to you is a matter of public record." (Cr.'s Ex. 46, at 3).

As to the additional claims information ordered to be produced in the OSC Order, Mr. Coffey relied at trial on the same email he sent to the Chapter 7 Trustee on September 27, 2017.  He asserted that this email provided the information requested by the Chapter 7 Trustee; however, this email is dated *prior to* the OSC Order and failed to provide, among other things, a single date of accrual for any of the claims or any estimated amounts owed for any of the claims.

Based on Mr. Coffey's own testimony and evidence, the Court finds that he willfully and intentionally failed to comply with the Initial Order, the Contempt Order, and the OSC Order.  It was clear from the evidence that some of the documents could have been obtained by Mr. Coffey, but he chose not to produce them.  In addition, Mr. Coffey's assertion that he believed he had complied with the Court's orders regarding the fifty-four claims is contrary to the evidence.  As previously pointed out, Mr. Coffey's email to the Chapter 7 Trustee was sent on September 27, 2017.  The OSC Order requiring Mr. Coffey to provide specific additional information was not entered on the Court's docket until June 14, 2018.  Because a subsequent order had to be issued to compel his compliance, the Court finds Mr. Coffey was aware that his email to the Chapter 7 Trustee was insufficient.  By failing to produce documents and failing to provide the additional information ordered by the Court, Mr. Coffey willfully and intentionally failed to obey this Court's orders and such noncompliance supports a finding that Mr. Coffey's discharge should be denied pursuant to Section 727(a)(6)(A).

(d)  Requirement that Documents be Organized

In their Show Cause Motion, CNR and the Chapter 7 Trustee asserted that although Mr. Coffey had been ordered to organize the documents produced at the October Exam, he had failed to do so.  After the hearing on the Show Cause Motion, the Court entered its OSC Order directing that Mr. Coffey deliver the documents to the Chapter 7 Trustee and ordering him to

"organize the documents in separate folders corresponding to the categories (b) through (q) outlined in the subpoena."  (Cr.'s Ex. 33, at 3).

The evidence before the Court is that the Debtor never complied with this portion of the Court's order.  As previously noted, Mr. Coffey initially produced documents in an unorganized state to the Chapter 7 Trustee in a box at the October Exam.  Indeed, he even stated at the October Exam that he was not aware of what was in the box.

The record reflects that after the box of documents was provided to the Chapter 7 Trustee, Ms. Kimery was tasked with making a list of items that were in the box.  At trial, when asked whether documents in the box were "in the same condition as when you first saw them," Ms. Kimery testified, "Yes."  (Tr. at 521).  She went on to testify that the only document that was produced in an organized manner was "the black binder that had the Workman's Compensation documents in it."  (Tr. at 521).  Mr. Coffey admitted this was correct.  During his case-in-chief, Mr. Coffey testified, "[A]s has been testified to, [the worker's compensation file] was the one file that was organized neatly."  (Tr. at 740).  The Court finds that Mr. Coffey willfully and intentionally disobeyed this Court's OSC Order by not taking the time to sort the documents he had produced by the categories on the subpoena.  Such noncompliance further supports a finding that Mr. Coffey's discharge should be denied pursuant to Section 727(a)(6)(A).

In conclusion, the Court finds that Mr. Coffey was given several opportunities to comply with the Court's orders and purge himself of contempt, but he consistently failed to do so.  At trial, CNR introduced the Contempt Order and the OSC Order which both found Mr. Coffey in contempt for failing to produce specific documents as ordered.  The Court believes the findings in these orders alone would have been sufficient to deny Mr. Coffey's discharge pursuant to

Section 727(a)(6)(A). *See Dowell,* 82 B.R. at 1003 ("[S]ection 727(a)(6)(A) of the Bankruptcy Code permit[s] the bankruptcy court to predicate denial of discharge on an intentional contempt, even though the contempt may have been purged by the time the bankruptcy court enters its order denying the contemnor's discharge.")

In addition, however, the evidence and testimony at trial revealed that not only did Mr. Coffey fail to purge his contempt cited in the Contempt Order and OSC Order, he continued to willfully and intentionally disobey the Court's orders in failing to comply with the OSC Order, further supporting a denial of his discharge.

For all the foregoing reasons, the Court finds Mr. Coffey's discharge should be denied pursuant to Section 727(a)(6)(A).

## B. <u>Section 727(a)(4)(A) – False Oaths</u>

CNR and the UST also ask the Court to deny Mr. Coffey's discharge pursuant to Section 727(a)(4)(A). Under this section, a debtor's discharge is to be denied if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4)(A). "Section 727(a)(4)(A) 'provides a harsh penalty for the debtor who deliberately secretes information from the court, the trustee, and other parties in interest in his case.'" *Korte*, 262 B.R. at 474 (quoting *Cepelak v. Sears (In re Sears)*, 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000)). "The Code requires nothing less than a full and complete disclosure of any and all apparent interests of any kind." *Id.* (quoting *Fokkena v. Tripp (In re Tripp)*, 224 B.R. 95, 98 (Bankr. N.D. Iowa 1998)). "The debtor's 'petition, including schedules and statements, must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts.'" *Id.* (quoting *Sears*, 246 B.R. at 347).

To establish that Mr. Coffey's discharge should be denied under this section, CNR and the UST must prove: "(1) [Mr. Coffey] made a statement under oath; (2) the statement was false; (3) [Mr. Coffey] knew the statement was false; (4) [Mr. Coffey] made the statement with fraudulent intent; and (5) the statement related materially to [Mr. Coffey's] bankruptcy case." *Lincoln Sav. Bank v. Freese (In re Freese)*, 460 B.R. 733, 738 (B.A.P. 8th Cir. 2011) (quoting *Fokkena v. Juehring (In re Juehring)*, 332 B.R. 587, 591 (Bankr. N.D. Iowa 2005)).  Each element must be proven by a preponderance of the evidence.  *Kaler v. Charles (In re Charles)*, 474 B.R. 680, 684 (B.A.P. 8th Cir. 2012) (citing *Allred v. Vilhauer (In re Vilhauer)*, 458 B.R. 511, 514 (B.A.P. 8th Cir. 2011)).

For the first and second elements, the Court must determine whether the statement made by Mr. Coffey was false and, if so, whether the statement was made under oath.  Courts have widely held that statements made by a debtor in his schedules or made at his first meeting of creditors are statements made under oath.  *See Casamatta v. Skibicki (In re Skibicki)*, No. A20-4011, 2021 WL 1396743, at *8 (Bankr. D. Neb. Apr. 12, 2021) ("Well-established case law holds that because the statements made by a debtor in his schedules and statements and at the meeting of creditors are signed under penalty of perjury and made under oath, they constitute 'oaths' for purposes of § 727(a)(4)(A)." (citing *Charles*, 272 B.R. at 684)).

Once a statement is determined to be a false oath, the Court must then determine whether the statement was made knowingly and fraudulently.  "The elements of 'knowingly' and 'fraudulently' may not be conflated. They each must be proven."  *McDermott v. Petersen (In re Petersen)*, 564 B.R. 636, 650 (Bankr. D. Minn. 2017) (quoting *Olympic Coast Inv., Inc. v. Wright (In re Wright)*, 364 B.R. 51, 76 (Bankr. D. Mont. 2007), *aff'd*, No. CV07-053, 2008 WL 160828 (D. Mont. Jan. 16, 2008), *aff'd*, 340 F. App'x 422 (9th Cir. 2009)).  "Whether the debtor

had the requisite knowledge and intent . . . is a matter of fact." *Allard v. Ellison (In re Ellison)*, No. 18-7019, 2019 WL 3183566, at *4 (Bankr. W.D. Ark. July 15, 2019) (citing *Sears*, 246 B.R. at 347).

"The term 'knowingly' requires that the debtor acted deliberately and consciously." *Dantzler v. Zulpo (In re Zulpo)*, 592 B.R. 231, 253 (Bankr. E.D. Ark. 2018) (citing *Merena v. Merena (In re Merena)*, 413 B.R. 792, 816 (Bankr. D. Mont. 2009), *aff'd*, No. 08-00046, 2009 WL 4914650 (B.A.P. 9th Cir. Dec. 10, 2009)). "Careless or reckless acts committed by the debtor do not satisfy the knowledge requirement of § 727(a)(4)(A)." *Snyder v. Zaligson (In re Zaligson)*, 591 B.R. 724, 739 (Bankr. D. Minn. 2018) (citing *Petersen*, 564 B.R. at 650).

"[D]etermination[s] concerning fraudulent intent depend[] largely upon an assessment of the credibility and demeanor of the debtor . . . ." *McDermott v. Govani (In re Govani)*, 509 B.R. 675, 683 (Bankr. N.D. Iowa 2014) (quoting *Phillips v. Epic Aviation (In re Phillips)*, 476 F. App'x 813, 816 (11th Cir. 2012)). "Intent can be 'proven by circumstantial evidence or by inferences drawn from a course of conduct.'" *Fowler v. Weathers (In re Weathers)*, No. 09-7203, 2011 WL 3207950, at *7 (Bankr. W.D. Ark. July 21, 2011) (quoting *Ramsay v. Jones (In re Jones)*, 175 B.R. 994, 1002 (Bankr. E.D. Ark. 1994)). Unlike the knowledge element, when determining whether the debtor's actions were fraudulent, "statements made with reckless indifference to the truth are regarded as intentionally false." *Korte*, 262 B.R. at 474 (quoting *Golden Star Tire, Inc. v. Smith (In re Smith)*, 161 B.R. 989, 992 (Bankr. E.D. Ark. 1993)).

The final element to be proven is that the false oath was material. To be material, the false oath must "bear[] a relationship to the bankrupt's business transactions or estate, or concern[] the discovery of assets, business dealings, or the existence or disposition of . . . property." *Id.* (quoting *Sears*, 246 B.R. at 347). "The threshold to materiality is fairly low . . . ."

54

*Charles*, 474 B.R. at 686 (quoting *Sears*, 246 B.R. at 347). "The value of the undisclosed asset does not determine whether the subject matter of the false oath is material and failure to disclose even an asset with minimal value may be material." *Freese*, 460 B.R. at 739 (citing *Palatine Nat'l Bank v. Olson (In re Olson)*, 916 F.2d 481, 484 (8th Cir. 1990)). The omission of an asset can be found to be material even if the discovery of the asset results in no benefit to the estate. *Id.*

Mr. Coffey's bankruptcy petition was introduced into evidence. Part 7 of the petition provides, in part, "I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct." (Cr.'s Ex. 1, at 5; UST's Ex. 15, at 5). Mr. Coffey's signature appears below this statement. Mr. Coffey's schedules were also introduced into evidence and contained a declaration signed by Mr. Coffey stating, "Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct." (Cr.'s Ex. 1, at 9; UST's Ex. 15, at 9). Mr. Coffey acknowledged that he signed this declaration. Also introduced was a copy of Mr. Coffey's SOFA.[9] At the end of the SOFA is the following declaration: "I have read the answers on this Statement of Financial Affairs and any attachments, and I declare under penalty of perjury that the answers are true and correct." (Cr.'s Ex. 1, at 52; UST's Ex. 15, at 52). Mr. Coffey's signature appears below the declaration.

CNR and the UST allege that Mr. Coffey made false oaths by omitting certain assets from his bankruptcy schedules, making false statements on his schedules and SOFA, and by making false statements during hearings held in his bankruptcy case. Because all the statements

---

[9] In this Part IV.B., the term "SOFA" refers to the statement of financial affairs filed in Mr. Coffey's Current Case.

relate to specific assets that were allegedly owned by Mr. Coffey, the Court will discuss the statements in relation to the various assets.[10]

### (1) Ownership Interest in Trumann Property

The first statements alleged as false oaths by CNR and the UST are statements made by Mr. Coffey regarding the Trumann Property in his schedules and during hearings held in connection with his bankruptcy case.

The petition reflects that Mr. Coffey was living at the Trumann Property when the petition was filed. The Trumann Property was not, however, listed in Part 1 of Schedule A/B in response to Question 1 where he was to list any property in which he had any legal or equitable interest at the time of filing bankruptcy.

Mr. Coffey was ordered by the Court to produce a copy of the document from the real estate records showing the ownership of the Trumann Property. Mr. Coffey testified under oath at the Final Contempt Hearing that this property belonged to his mother and stated, "I don't own—I have no ownership interest in that house." (Cr.'s Ex. 34, at 49). He further testified that at some point he "went over to the courthouse and got the deed record and sent it to [the Chapter 7 Trustee]." (Cr.'s Ex. 34, at 49).

CNR and the UST both introduced into evidence a copy of the warranty deed recorded August 15, 2003, in the Poinsett County, Arkansas, real estate records reflecting the transfer of the Trumann Property from Martha A. Lakey and William Lakey to seven persons, including

---

[10] Although the Court will discuss several assets in this section, the Court will not discuss the Maplewood Properties. Based on the evidence and the history of the litigation concerning the Maplewood Properties, the Court finds that Mr. Coffey believed he had an ownership interest in the Maplewood Properties at the time the petition was filed and listed the Maplewood Properties on his schedules because of this belief. Therefore, the Court does not believe the listing of the Maplewood Properties was a false oath as contemplated by Section 727(a)(4)(A). The Court also finds insufficient evidence was introduced to show Mr. Coffey made false oaths in connection with his wife's income, his ownership interest in certain collectible books, his ownership in certain vehicles, and his improper listing of his ownership interest in Coherent Investments. Therefore, the Court will not discuss these assets.

Mr. Coffey, subject to a life estate reserved for Mrs. Lakey.  (Cr.'s Ex. 35; UST's Ex. 29).
Martha A. Lakey is Mr. Coffey's mother.  Contrary to his testimony at the Final Contempt
Hearing that he obtained the deed from the real estate records and produced it to the Chapter 7
Trustee, Mr. Coffey testified at trial that he had never seen this document before.  In fact,
Mr. Coffey stated that he did not know this deed existed, so he did not "even know to go look for
it."  (Tr. at 621).  Then, after CNR and the UST introduced a copy of the assessor's record for the
Trumann Property, Mr. Coffey testified that he believed the assessor's record is what he
produced to the Chapter 7 Trustee.  The assessor's record included a sales history reflecting that
a transfer was made in 2003 with "M Lakey Life" as the grantor, indicating his mother made a
transfer of the property reserving a life estate in the real estate.  (Cr.'s Ex. 36, at 2; UST's Ex. 30,
at 2).  Mr. Coffey later changed his testimony again at trial and stated that what he thought he
produced to the Chapter 7 Trustee was the Poinsett County paid tax receipts for the Trumann
Property for 2016 through 2020, or something similar to them.

No evidence was introduced to indicate that Mr. Coffey was divested of his ownership
interest in the Trumann Property prior to the filing of his bankruptcy case.  Therefore, based on
the evidence, the Court finds that Mr. Coffey held a one-seventh remainder interest in the
Trumann Property at the time his bankruptcy petition was filed.  The Court finds that his failure
to list the Trumann Property on his schedules was a false oath.  In addition, the Court finds that
the statements Mr. Coffey made at the Final Contempt Hearing that he had produced a copy of
the deed to the Chapter 7 Trustee and he had no interest in the Trumann Property were
statements made under oath that were false.  Therefore, the first and second elements have been
met as to this omission and these statements.

At trial, Mr. Coffey asserted he was unaware of the warranty deed and had never seen the deed before.  The Court does not find Mr. Coffey's testimony on this issue credible.  As discussed above, Mr. Coffey's background includes numerous real estate transactions as well as substantial litigation regarding real estate matters.  The Court finds that Mr. Coffey exhibited a reckless disregard of the truth of his ownership interest in the Trumann Property, an interest clearly disclosed in the Poinsett County real estate records and readily available to Mr. Coffey.  For these reasons, the Court finds that Mr. Coffey's failure to list the Trumann Property as an asset on his schedules, and his testimony at the Final Contempt Hearing that he gave a copy of the deed to the Chapter 7 Trustee and did not have an ownership interest in the Trumann Property were made with knowledge of their falsity and with fraudulent intent.  Therefore, the third and fourth elements have been met as to this omission and the statements.

Finally, the Court finds that the false statements were material.  A statement is material if it "bears a relationship to the bankrupt's . . .  estate, or concerns the discovery of assets." *Korte*, 262 B.R. at 474.  The Court finds that an ownership interest in real property meets these criteria.  The Court finds that Mr. Coffey's failure to list the Trumann Property in his schedules and his statements made during the Final Contempt Hearing concerning the Trumann Property were material, meeting the fifth element.

Based on the foregoing, the Court finds the evidence supports a finding that Mr. Coffey's discharge should be denied pursuant to Section 727(a)(4)(A).

### (2)  Failure to List Scottrade Accounts

On his Schedule A/B, in response to Question 17, asking whether he "own[ed] or ha[d] any legal or equitable interest in . . . [d]eposits of money *Examples*: Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other

similar institutions," Mr. Coffey checked the box "[n]o."  (Cr.'s Ex. 1, at 14; UST's Ex. 15, at 14).  Question 20 in Mr. Coffey's SOFA also related to financial accounts and asked, "Within 1 year before you filed for bankruptcy, were any financial accounts or instruments held in your name, or for your benefit, closed, sold, moved, or transferred?"  (Cr.'s Ex. 1, at 49; UST's Ex. 15, at 49).  Mr. Coffey again responded by checking the box "[n]o."  (Cr.'s Ex. 1, at 49; UST's Ex. 15, at 49).

At trial, CNR and the UST offered sufficient evidence to show that Mr. Coffey had an interest in two Scottrade accounts, one ending in 7424 and the other ending in 7492.  The accounts were either open at the time the Current Case was filed, or they were closed within one year of the filing of the Current Case.  The Court will discuss each account separately below.

(a)  Scottrade Account Ending in 7424

The evidence is clear that Mr. Coffey held an interest in a Scottrade account ending in 7424 at the time of his bankruptcy filing.  At the Final Contempt Hearing, Mr. Coffey was questioned about the account.  He acknowledged having a Scottrade account but testified that there was no money in the account.  When questioned about why he had not produced copies of the statements for the Scottrade account, he testified there were no paper statements, and he would not know where to look for electronic statements.

Contrary to his testimony, CNR and the UST introduced a copy of a motion filed by Mr. Coffey in May 2017 titled, "*Debtors [sic] Motion for Show Cause Order Against Paula Sue Coffey Individually, Attorney Hillary Hodgkins Individually, Maximus Child Support Service, and the State of Tennessee Department of Human Services, to Show Cause Why They Should Not be Found in Willful Contempt of the Standing Order of this Court of an Automatic Stay*" (the "**Paula Contempt Motion**").  In his Paula Contempt Motion, Mr. Coffey asked this Court to

find Paula Sue Coffey in contempt for garnishing a Scottrade account with an account number ending in 7424. Mr. Coffey asserted that "the Scottrade account is not only a joint account, but one that has [his] disability monies and sole income deposited into it." (Cr.'s Ex. 51, at 2; UST's Ex. 24, at 2). Mr. Coffey asserted that Paula Sue Coffey violated the automatic stay by having a lien placed on the Scottrade account. From this evidence, it is clear to the Court that Mr. Coffey held an interest in the Scottrade account ending in 7424 at the time his bankruptcy case was filed and that his failure to list the account on his schedules constitutes a false oath, meeting the first and second elements.

The evidence also supports a finding that the false oath was made knowingly and with fraudulent intent. Mr. Coffey filed the Paula Contempt Motion less than six months after he filed this bankruptcy case. Further, as previously noted, Mr. Coffey stated in the motion that all his disability income was being deposited into this Scottrade account. Mr. Coffey's disability income constituted substantially all of Mr. Coffey's income at the time the bankruptcy case was filed. The Court finds it implausible that Mr. Coffey would have forgotten about this account or would have inadvertently failed to list it on his schedules. Instead, the evidence supports a finding that Mr. Coffey was aware of the account and continued to monitor the account during his case. For these reasons, the Court finds that Mr. Coffey's failure to list this account on his schedules was done knowingly and intentionally, meeting the third and fourth elements.

Finally, the Court finds Mr. Coffey's omission of this Scottrade account was material in that it concerned his financial condition. Mr. Coffey had an obligation to disclose all his assets on his schedules so interested parties could be fully aware of his assets. Therefore, the fifth element has been met.

For all these reasons, the Court finds that Mr. Coffey's failure to disclose his Scottrade account ending in 7424 supports a finding that his discharge should be denied pursuant to Section 727(a)(4)(A).

(b) Scottrade Account Ending in 7492

As to the Scottrade account ending in 7492, CNR and the UST introduced into evidence a letter sent from Scottrade to Mr. Coffey dated June 17, 2016. The letter is addressed to "Leslie Coffey," and concerns a Scottrade account ending in 7492.[11] (Cr.'s Ex. 52; UST's Ex. 34). Although this letter does not provide adequate evidence for the Court to conclude that the account was open at the time Mr. Coffey's bankruptcy case commenced, the letter does offer sufficient evidence that an account ending in 7492 was active on June 17, 2016. Based on this evidence, the Court can conclude that one of two things must be true—either the account remained open on the petition date and Mr. Coffey should have listed the account on his schedules, or the account was closed between June 17, 2016 and the petition date and should have been listed in response to Question 20 on his SOFA. Because Mr. Coffey did neither of these things, the Court finds Mr. Coffey made a false oath by failing to list this account on either his schedules or SOFA. Therefore, the first two elements are met.

The Court also finds that Mr. Coffey's false oath was made knowingly and fraudulently. The date of the letter proves that the Scottrade account was used relatively close in time to the bankruptcy filing. In addition, the letter suggests that Mr. Coffey was familiar with the transactions that were being processed on the account, and even took action to challenge charges

---

[11] During cross-examination, Mr. Coffey asserted the Scottrade letter may have been sent to his daughter, also named Leslie Coffey, and that the account may have been held in her name instead of his. The Court finds this explanation unconvincing. The evidence before the Court is that this June 17, 2016 Scottrade letter was one of the documents that Mr. Coffey provided to the Chapter 7 Trustee in response to CNR and the Chapter 7 Trustee's subpoena duces tecum. The fact that this letter was in Mr. Coffey's possession, and that he provided this document in response to the subpoena and subsequent court orders, leads the Court to find that Mr. Coffey was the named recipient of the letter and that Mr. Coffey held an interest in the account.

on the account close in time to the petition date.  The Court believes Mr. Coffey knew the

account existed and his failure to disclose the account was done knowingly.  In addition, the

Court finds that, at a minimum, Mr. Coffey acted with a reckless disregard for the truth in not

disclosing the account.  For these reasons, the Court finds that Mr. Coffey's failure to disclose

the account was made knowingly and fraudulently, meeting the third and fourth elements.

Finally, the Court finds that the omission of the Scottrade account was material.

Although no evidence has been introduced as to the value of the Scottrade account on the

petition date, disclosure of the account may have put the Chapter 7 Trustee on notice of potential

assets that he could recover for the benefit of the estate.  For these reasons, the Court finds that

the final element has been met.

For all these reasons, the Court finds that Mr. Coffey's failure to disclose his Scottrade

account ending in 7492 supports a finding that his discharge should be denied pursuant to

Section 727(a)(4)(A).

### (3)  Failure to List Main Street Residence on SOFA

The Court also finds that Mr. Coffey made a false oath on his SOFA by failing to list all

residences he had occupied during the three years prior to the filing of his bankruptcy case.

Question 2 of the Debtor's SOFA asked, "During the last 3 years, have you lived anywhere other

than where you live now?"  (Cr.'s Ex. 1, at 41; UST's Ex. 15, at 41).  Mr. Coffey responded by

checking the box "[n]o."  (Cr.'s Ex. 1, at 41; UST's Ex. 15, at 41).  However, during trial,

Mr. Coffey testified that he and his wife lived at 316 S. Main Street, in Jonesboro, Arkansas

(previously defined as the "**Main Street Residence**") from approximately May 9, 2014 until

March 5, 2015.  He introduced a billing history for the electric service for the Main Street

Residence substantiating it as his residence during this time period.  He testified, "[T]hat's where

62

Jill Coffey and I lived during—well, she lived there until Kelsey died on 3/05 of 2015.  And I stayed until . . . the end of April when the lease was up." (Tr. at 754).  The Debtor further stated, "When I moved . . . out of that unit, when the lease was up, I proceeded to go to Trumann and stay." (Tr. at 754).

Based on Mr. Coffey's testimony, he resided at the Main Street Residence within three years of his bankruptcy case being filed.  Therefore, the Court finds his representation that he had no other residences within the three years prior to the filing of his case was a false oath.  The first and second elements have been met.

The Court also finds that Mr. Coffey knew the statement was false, and that he made the statement with fraudulent intent.  At trial, Mr. Coffey introduced billing information for the electric service to support the fact that he had resided at the Main Street Residence.  The Court believes the fact that Mr. Coffey introduced this evidence nearly six years after his case was filed supports a finding that he was aware of his prior residence at the time of filing.  Over the last six years, Mr. Coffey has made no effort to disclose this prior residence to the Chapter 7 Trustee or any of his creditors, or to amend his SOFA to correct the omission of the Main Street Residence. Based on Mr. Coffey's actions, and the totality of the circumstances surrounding the disclosure of the Main Street Residence, the Court finds the third and fourth elements have been met.

Finally, the Court finds that the false statement was material.  Once again, it is important to the administration of Mr. Coffey's estate that he disclose all required information to the Chapter 7 Trustee and to creditors so that they can investigate potential assets for the estate.  He did not disclose the Main Street Residence until trial.  The Court finds that this omission from his SOFA was material.  Therefore, the final element has been met.

For these reasons, the Court finds Mr. Coffey's failure to list the Main Street Residence on his SOFA supports a finding that his discharge should be denied pursuant to Section 727(a)(4)(A).

### (4)   Failure to List Insurance Income on SOFA

CNR and the UST next allege that Mr. Coffey made a false oath by listing his disability income as pension or retirement income on his Schedule I and by failing to list this income on his SOFA. Although the Court finds Mr. Coffey's representations regarding the source of his income were incorrect, the Court does not believe the evidence supports a finding that Mr. Coffey intended to fraudulently state his income source by listing his income the way he did. Mr. Coffey's Schedule I reflected his monthly income as $5,100.00, and he has consistently stated that the source of this income was a State Farm disability insurance policy. Although the Court agrees that Mr. Coffey had an obligation to update his schedules to correct this mistake, considering the totality of the circumstances, the Court does not believe the facts concerning the disclosure of his income support a finding that his discharge should be denied pursuant to Section 727(a)(4)(A) on this basis.

### (5)   Falsely Listing Residence at Time of Filing

CNR and the UST also assert that Mr. Coffey made a false statement by listing the Trumann Property as his residence on his bankruptcy petition. Although CNR and the UST presented several documents to support their assertion that Mr. Coffey was residing elsewhere for the majority of the 180-day period prior to the filing of his case, the Court finds Mr. Coffey's testimony credible that he was residing in Arkansas at the time of filing. In his testimony, Mr. Coffey explained that he moved back to Arkansas to take advantage of the Medicaid expansion under the Affordable Care Act and to be closer to a specialist in Little Rock who "at

the time, [was] only one of five doctors that specialized in the type of injury [Mr. Coffey] had."
(Tr. at 611). The Court finds Mr. Coffey's testimony more persuasive than the documents
introduced attempting to show that he may have resided elsewhere.

For these reasons, the Court does not believe the facts concerning Mr. Coffey's residence
at the time the petition was filed support a finding that his discharge should be denied pursuant to
Section 727(a)(4)(A).

### (6) Failure to List Rossville Metal

The last alleged false oath the Court will consider is Mr. Coffey's failure to list an
ownership interest in Rossville Metal on his schedules. CNR and the UST both contend that
Mr. Coffey held an ownership interest in Rossville Metal at the time the company was created,
and that he must still own an interest now because no documentation has been produced to show
that his ownership interest was ever conveyed to a third party. Mr. Coffey asserts he has never
held an ownership interest in Rossville Metal. Instead, he asserts that Rossville Metal was
initially owned by his wife and the Children's Trust, and later the Children's Trust conveyed the
interest it held to each of the children, individually. For the reasons stated below, the Court finds
the evidence weighs in favor of Mr. Coffey on this issue and that Mr. Coffey never held an
ownership interest in Rossville Metal.

The primary document relied on by CNR and the UST was a business search record from
the Georgia Secretary of State's office, which included a certificate of organization and articles
of organization filed August 13, 2008, to form Rossville Metal. At the time of this filing,
Georgia law provided: "The person executing the document [for filing] shall sign it and state
beneath or opposite his or her signature his or her name and the capacity in which he or she
signs." GA. CODE ANN. § 14-11-205(b) (1993). The statute also provided four capacities in

which an individual could execute such a document.  The document could be "executed: (1) [b]y any member; (2) [b]y any manager if management of the limited liability company is vested in one or more managers; (3) [b]y any organizer if the limited liability company has been formed but it has no members or managers; or (4) [i]f the limited liability company is in the hands of a receiver, trustee, or other court-appointed fiduciary, by that fiduciary."  Ga. Code Ann. § 14-11-205(a) (1993).  Mr. Coffey executed the articles of organization as "Member/Manager" of Rossville Metal.  (Cr.'s Ex. 10, at 4; UST's Ex. 39, at 2).

Although the business search record is persuasive that Mr. Coffey held an ownership interest in Rossville Metal, the Court believes the persuasiveness of this document must be discounted for two reasons.  First, no evidence was introduced to contradict Mr. Coffey's testimony that he was unable to select "manager" as his capacity while filling out the online registration form for Rossville Metal.[12]  Second, Mr. Coffey testified that he considered himself to be the "manager" of Rossville Metal at the time of registration.  No evidence was presented to contradict Mr. Coffey's representation, and the Court finds Mr. Coffey's testimony credible on this issue.  Based on Mr. Coffey's representation that he was "managing" Rossville Metal on behalf of, and as trustee of, the Children's Trust, the Court finds that Mr. Coffey has provided a persuasive explanation as to why he may have selected "Member/Manager" when filling out the online registration form and why the business search record does not accurately reflect the true ownership of Rossville Metal.

Another document the Court considered was the *Debtor's Amendment to Chapter 11 Voluntary Petition* filed in the 2008 Case.  The Court finds the document, on its face, suggests that Mr. Coffey had some type of interest in Rossville Metal.  In the document, Mr. Coffey stated

---

[12] Although the Court believes the previously quoted statutory text provides some evidence that such a selection would have been available to Mr. Coffey, without further evidence, the Court is not willing to make this presumption.

that he was "amend[ing] [his] Statement of Financial Affairs Number 18 to add Rossville Metal Recyclers, a recycling company." (UST's Ex. 7, at 1). Question 18 asked for the name of all businesses "in which the debtor was an officer, director, partner, or management executive." (Cr.'s Ex. 9, at 7; UST's Ex. 6, at 7).

The Court does not believe this amendment contradicts Mr. Coffey's contention that he held no ownership interest in Rossville Metal for three reasons. First, Mr. Coffey testified about what led him to file this amended pleading. According to Mr. Coffey, after someone raised an issue about Lesco Services and Rossville Metal, he had to amend his schedules to list them. Mr. Coffey went on to state, "I didn't own Rossville Metals, but I was actively . . . managing it." (Tr. at 408). Second, in reviewing the document itself, the Court finds that the amendment is silent as to Mr. Coffey's relationship to Rossville Metal. It states that the amendment was made to add two entities: Lesco Services and Rossville Metal. While the pleading reflects that Lesco Services was being added as a "sole proprietorship," the pleading does not provide the capacity in which Rossville Metal was being added. The Court finds that this lack of ownership information in the amendment is consistent with Mr. Coffey's testimony and weighs in favor of finding that Mr. Coffey held no ownership interest in Rossville Metal. Third, as stated above, Question 18 included the position "management executive," which arguably could include a manager.

The Court also considered a motion to sell filed in the Peerless Chapter 11 case. During its bankruptcy case, Peerless Storage filed a motion to sell certain assets free and clear of liens, including certain materials that would be obtained after the demolition of several buildings owned by Peerless Storage. In that motion, Rossville Metal was described as a business wholly owned by Les Coffey, the principal of Peerless Storage. CNR and the UST assert this statement

is evidence that Mr. Coffey held an ownership interest in Rossville Metal. The Court agrees. The pleading clearly states that Mr. Coffey is the sole owner of Rossville Metal. However, once again, the Court finds the weight given to this pleading must be discounted. Although the pleading does state Mr. Coffey is the sole owner of Rossville Metal, the pleading itself is not a record of the actual ownership of the business entity, was not prepared by Mr. Coffey, and is not signed by Mr. Coffey.

The Court finds that the documentary evidence discussed above fails to prove by a preponderance of the evidence that Mr. Coffey *had* an ownership interest in Rossville Metal. Moreover, other documentary evidence supports a finding that Mr. Coffey *did not have* an ownership interest in Rossville Metal. These documents include the company's organizational documents and the minutes from a members' meeting.

Mr. Coffey introduced a copy of the Interlocutory Order issued by the Labor and Industry Review Commission for the state of Wisconsin (previously defined as the "**Commission**") dated September 30, 2019.[13] Similar to the issue before this Court, it appears that the record before the Commission also contained conflicting evidence as to Mr. Coffey's ownership interest in Rossville Metal. The Commission noted that "on the application Coffey listed his title as 'TRUSTEE,' but listed '100' in the box asking for his percentage of the business ownership [and] [h]e also listed his duties as 'MANAGER.'" (Debtor's Ex. 2, at 3). The evidence before the Commission included an operating agreement of Rossville Metal "which ha[d] an effective date of October 15, 2009." (Debtor's Ex. 2, at 5). The Interlocutory Order stated that the operating agreement "list[ed] Coffey as trustee for his children's trust's ownership of 70% of Rossville, and his wife as the owner of the other 30% of Rossville." (Debtor's Ex. 2, at 5). The

---

[13] Although the Interlocutory Order is not determinative, it is persuasive on the issue of ownership.

Commission found the document "credible and determinative of Coffey's personal non-membership status." (Debtor's Ex. 2, at 5).

Although the Court does not have in evidence a copy of the document identified by the Commission in its Interlocutory Order, the Court believes the Commission's findings concerning that document are consistent with the documents introduced by Mr. Coffey at trial. Specifically, the Court finds the Commission's order supports a finding that Mr. Coffey considered himself to be the "manager" of Rossville Metal. Taking this to be true, the Court, once again, finds Mr. Coffey has sufficiently explained why he selected "Member/Manager" on the articles of organization out of the limited number of options on the online registration system.

Mr. Coffey also introduced into evidence the Operating Agreement for Rossville Metal dated April 8, 2018, and the minutes from a meeting of the members dated April 6, 2018. (Debtor's Ex. 1). In reviewing these documents, the Court believes they support a finding that Mr. Coffey never had an ownership interest in Rossville Metal. In Section 2.1 of the Operating Agreement, the document provides: "The company was originally formed on 08/13/2008. This is the first reorganization of the entity on April 09, 2018 to include the adult children of Leslie D. Coffey whom held previous ownership through a trust." (Debtor's Ex. 1, at 4).

The minutes introduced into evidence reflect that a meeting was called on April 6, 2018, "to distribute assets from the trust early to the beneficiaries as they recently turned 18." (Debtor's Ex. 1, at 25). The minutes further explained, "Said assets are the ownership interest in [Rossville Metal]. Prior to the meeting the children owned 70% of Rossville Metal[] through the trust." (Debtor's Ex. 1, at 25). The Court finds these documents persuasive, and that they support Mr. Coffey's testimony that Dana Jill Coffey and the Children's Trust were the original

owners of Rossville Metal and that Mr. Coffey managed Rossville Metal as trustee of the Children's Trust.

Taken together, Mr. Coffey's unwavering testimony concerning his non-ownership interest in Rossville Metal, the findings of the Commission concerning the operating agreement with the 2009 effective date, the Operating Agreement dated 2018, and minutes of the member meeting from 2018, support a finding that Mr. Coffey did not have an ownership interest in Rossville Metal to disclose in his schedules or SOFA. Therefore, his failure to disclose any interest in Rossville Metal does not support a finding that his discharge should be denied pursuant to Section 727(a)(4)(A).

In conclusion, the Court finds that Mr. Coffey made false oaths in connection with the Current Case concerning his ownership interest in the Trumann Property, his ownership interest in two separate Scottrade accounts, and residences where he resided in the three years prior to the bankruptcy filing. These false oaths were made knowingly and fraudulently and are material to his bankruptcy case. Therefore, for the reasons stated above, the Court finds that Mr. Coffey's discharge should be denied pursuant to Section 727(a)(4)(A).

**C. Request for Bar to Refiling**

In its complaint, CNR requests that the Court bar Mr. Coffey from filing another bankruptcy case for eight years. Although this Court does have the power to place a bar on Mr. Coffey's ability to refile, it has been widely recognized that such a bar should be reserved for the most culpable conduct. "[A] prohibition on refiling is typically reserved for instances . . . 'where a debtor files a series of bankruptcy petitions that are strategically timed to thwart a secured creditor from foreclosing on its collateral.'" *In re Steiner*, No. 20-41952, 2022 WL

419942, at *3 (Bankr. W.D. Mo. Feb. 10, 2022) (quoting *Steiner v. Wilmington Sav. Fund Soc'y (In re Steiner)*, 613 B.R. 176, 179 (B.A.P. 8th Cir. 2020)).

To determine whether a bar should be imposed, courts often consider whether the bankruptcy case was filed in good faith. "Determining whether a bankruptcy filing is made in good or bad faith is a factual inquiry based on the totality of the circumstances." *Id*. (citing *Steiner*, 613 B.R. at 179). "Several factors may be evaluated to determine bad faith, including a debtor's 'atypical' conduct and any attempt to manipulate or abuse the bankruptcy process . . . ." *Id*. (citing *Steiner*, 613 B.R. at 179). Typically, a bar to refiling is a remedy sought together with dismissal of a case. The case law is well-settled that "dismissing a case with prejudice is a drastic remedy which should only be used in extreme circumstances." *In re Merayo*, 319 B.R. 883, 885 (Bankr. E.D. Ark. 2005) (citing *In re Penny*, 243 B.R. 720, 727 (Bankr. W.D. Ark. 2000)).

As has been discussed, Mr. Coffey disobeyed this Court's orders on multiple occasions and made false oaths in connection with the case. Nevertheless, the Court does not believe the totality of the facts and circumstances in this case warrant a bar to refiling.

The Court finds the facts in the Current Case are substantially different than most cases in which a bar to refiling is issued. In most cases, the bar is preceded by a debtor filing numerous cases in a very brief period of time to hinder or delay certain creditor actions. In such cases, a bar makes sense. By instituting such a bar, courts can prevent debtors from using the automatic stay to perpetually frustrate secured creditors from obtaining relief. This is why "a prohibition on refiling is typically reserved for [such] instances." *Steiner*, 2022 WL 419942, at *3.

Here, the Court finds that the Current Case has been pending for nearly six years. Mr. Coffey's two previous Chapter 11 cases were filed in 2005 and 2008. The 2005 Case

71

resulted in a confirmed plan of reorganization, and the 2008 Case was dismissed.  Thereafter, Mr. Coffey filed two cases in Arkansas: the 2013 Case and the Current Case in 2016.  The evidence is not sufficient to find that Mr. Coffey is a serial bankruptcy filer or that any secured creditors will be injured if a bar is not imposed.  The Court finds these facts weigh against imposing a bar.

The Court also believes Mr. Coffey's reason for filing the Current Case must be taken into consideration.  Based on the plan of reorganization filed early in the case when the case was still being administered as a Chapter 13 proceeding and other litigation in the case, the Court finds that Mr. Coffey was attempting to resolve issues involving the Maplewood Properties. Throughout the numerous hearings the Court has held in this case involving the Maplewood Properties, it has become evident to the Court that Mr. Coffey believed he held an interest in the Maplewood Properties and sought to protect his interest.

As a result of postpetition litigation before the Circuit Court of Hamilton County, Tennessee, title to the Maplewood Properties has been found to be held by CNR.  At trial, CNR introduced into evidence a copy of a memorandum opinion issued in July 2019 by the Circuit Court of Hamilton County, Tennessee, in which the court found as follows: "Title to the [Maplewood Properties] is held by CNR Holdings, LLC.  Said title to the [Maplewood Properties] is good, clear marketable title in fee simple."  (Cr.'s Ex. 50, at 2–3).  Based on the Hamilton County Circuit Court's memorandum opinion, the Court does not find the Maplewood Properties should be a motivating factor for Mr. Coffey to refile a subsequent bankruptcy petition, as it appears to the Court that Mr. Coffey no longer has an interest in the properties. Based on these facts, the Court finds Mr. Coffey's motivation for filing the Current Case does not weigh in favor of barring him from filing a subsequent case.

72

For the foregoing reasons, the Court finds that the facts in the Current Case are substantially different than other cases in which a bar to refiling has been ordered. Instead, the Court believes the appropriate remedy for Mr. Coffey's actions in the Current Case is the one already imposed: the denial of his discharge.

For the reasons stated, CNR's request to bar Mr. Coffey from filing another bankruptcy case for eight years is denied.

### D. CNR's Request for a Referral to the United States Attorney's Office

The next issue the Court must consider is CNR's request that the Court refer Mr. Coffey to the United States Attorney's Office (the "**USAO**") for potential charges of bankruptcy fraud. The Court does not believe CNR's request is proper. The relevant statute under which the Court would make such a referral is 18 U.S.C. § 3057. This section provides:

> Any judge . . . having reasonable grounds for believing that any violation under chapter 9 of this title or other laws of the United States relating to insolvent debtors . . . has been committed, or that an investigation should be had in connection therewith, shall report to the appropriate United States attorney all the facts and circumstances of the case, the names of the witnesses and the offense or offenses believed to have been committed.

18 U.S.C. § 3057(a).

In interpreting this statute, courts have widely concluded that the statute does not confer standing on creditors to ask the courts to make such referrals. "Courts repeatedly have held that although [Section 3057] imposes a duty on the bankruptcy court to make a criminal referral when it has 'reasonable grounds for believing' that a bankruptcy crime has occurred, the statute does not confer standing on litigants to request such a referral from the court." *In re Baroni*, No. 12-bk-10986, 2022 WL 3267941, at *12 (Bankr. C.D. Cal. Aug. 9, 2022) (quoting 18 U.S.C. § 3057). "Nothing in titles 11, 18, 28, or the Federal Rules of Bankruptcy Procedures explicitly empowers the defendant with the right to move the court [to make such a referral]." *Va. Hosp.*

73

*Ctr. Arlington Health Sys. v. Akl (In re Akl)*, No. 07-10026, 2010 WL 1667294, at *1 (Bankr. D.D.C. Apr. 23, 2010).

The Court agrees with these courts and finds that CNR does not have standing to ask this Court to refer Mr. Coffey to the USAO.  CNR's request that the Court refer Mr. Coffey to the USAO is denied.

### E.  CNR's Request for Attorney's Fees and Costs

The final issue the Court must address is CNR's request that Mr. Coffey be held responsible for CNR's attorney's fees and costs incurred during its adversary proceeding. Because different standards govern each of these awards, the Court will discuss the two requests separately.

#### (1)  Attorney's Fees

As recognized by the United States Supreme Court, the starting point for analyzing whether attorney's fees should be awarded is the so-called "American Rule." *Baker Botts L.L.P. v. ASARCO* LLC, 576 U.S. 121, 126 (2015).  Pursuant to this rule, "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Id*. (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252–53 (2010)).  The Supreme Court has explained that it "will not deviate from the American Rule 'absent explicit statutory authority.'" *Id*. (quoting *Buckhannon Board & Care Home, Inc. v. W. Va. Dept. of Health & Hum. Res.*, 532 U.S. 598, 602 (2001)).  Consistent with Supreme Court precedent, Federal Rule of Civil Procedure 54(d)(2)(B)(ii), made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7054(b)(2)(A), provides a claim for attorney's fees must "specify . . . the statute, rule, or other grounds entitling the movant to the award."  FED. R. CIV. P. 54(d)(2)(B)(ii).

In reviewing the request for attorney's fees, CNR cites to Section 105(a) of the Bankruptcy Code in support of its request. However, as previously recognized in this jurisdiction, "Section 105(a) standing alone does not give a bankruptcy court the authority to award attorney's fees." *In re Gjestvang*, 405 B.R. 316, 322 (Bankr. E.D. Ark. 2009). Accordingly, the Court finds that awarding CNR its attorney's fees would be improper. CNR's request for attorney's fees is denied.

### (2) Costs

The Court must also decide whether to award CNR its costs incurred in pursuing its adversary proceeding. Federal Rule of Bankruptcy Procedure 7054(b)(1) states, "The court may allow costs to the prevailing party except when a statute of the United States or these rules otherwise provides." FED. R. BANKR. P. 7054(b)(1). "The court has broad discretion in awarding costs." *Dwelle v. Arvest Bank (In re Dwelle)*, No. 13-7081, 2015 WL 13776234, at *2 (Bankr. W.D. Ark. May 27, 2015) (first citing *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 762 (8th Cir. 2006); then citing *Standley v. Chilhowee R-IV Sch. Dist.*, 5 F.3d 319, 324 (8th Cir. 1993)). In reviewing the totality of the circumstances in this case, including the vast amount of litigation brought by both CNR and Mr. Coffey, the Court finds each party should be responsible for its own costs. CNR's request for costs is denied.

### V. CONCLUSION

For the reasons stated herein, the Court finds CNR and the UST have met their burden of proving that Mr. Coffey's discharge should be denied pursuant to Section 727(a)(6)(A) and Section 727(a)(4)(A). Mr. Coffey refused to obey lawful orders of this Court, and he knowingly and fraudulently made material false oaths in connection with this bankruptcy case. Mr. Coffey's discharge is denied on these grounds.

75

Having denied Mr. Coffey's discharge under Section 727(a)(6)(A) and Section 727(a)(4)(A), the Court declines to consider whether Mr. Coffey's discharge should also be denied under Section 727(a)(2)(A), (a)(3), (a)(4)(D), and/or (a)(5).

In addition, for the reasons stated herein, CNR's request to bar Mr. Coffey from filing another bankruptcy case is denied; CNR's request for a referral to the USAO is denied, as CNR does not have standing to make such a request; and CNR's request for attorney's fees and costs is denied.

Separate judgments shall be entered in each adversary proceeding.

**IT IS SO ORDERED.**

Phyllis M. Jones
United States Bankruptcy Judge
Dated:  10/20/2022